## TRADERS & GENERAL INS. CO. v. BASS.

No. 4349.

Court of Civil Appeals of Texas.

Feb. 21, 1946.

Rehearing Denied April 3, 1946.

Strasburger, Price, Holland, Kelton & Miller, of Dallas, for appellant.

Fulmer & Fairchilds, of Nacogdoches, and Musslewhite & Fenley, of Lufkin, for appellee.

COE, Chief Justice.

Zack T. Bass brought this suit in the district court of Angelina County, Texas, against appellant, Traders & General Insurance Company, as the carrier of compensation insurance for Texas Foundries, Inc., seeking compensation upon allegations that on or about December 24, 1943, while working for Texas Foundries, Inc., in Angelina County, he was suddenly overcome with dust of steel, dirt and other impuri-

ties by inhaling same and that same affected his general health and resulted in pneumonia. He alleged that he suffered total, permanent disability and he sought compensation accordingly. A trial to a jury resulted in a verdict upon which the trial court gave Bass a judgment for $15.00 per week for 104 weeks from December 24, 1943, and an additional 296 weeks compensation at the rate of $6.00 per week following thereafter. The defendant below has perfected its appeal to this court.

There is no question raised as to the sufficiency of the pleadings. Therefore we will not undertake to summarize them other than to say that they sufficiently alleged all issues raised by the evidence hereinafter set out.

Appellant's first two points upon which it predicates this appeal complain of the action of the trial court in overruling paragraphs 4 and 5 of its motion for a new trial, paragraph 4 being, "The court erred in overruling defendant's motion for instructed verdict"; paragraph No. 5 reading: "The court erred in overruling defendant's motion for judgment notwithstanding the jury's verdict." While these assignments are very general, we will, nevertheless, consider them.

Since these assignments only raise the issue that there was no evidence to support the verdict of the jury, as distinguished from insufficient evidence, our statement will be made from appellee's viewpoint. Fry v. Dixie Motor Coaches, Inc., 142 Tex. 589, 180 S.W.2d 135. The following is a summary of the evidence offered by appellee in support of his allegations.

Zack Bass, plaintiff, testified: On December 23, 1943, and for several weeks prior thereto, he was employed by Texas Foundries, Inc. Up until the last two days, December 22 and 23, 1943, he worked in the cleaning department, placing iron in the "cleaner," assorting it, and taking it to the grinding department. On December 22 and 23, 1943, by instructions of his foreman, he worked part time sweeping and cleaning up around the grinding machines in the grinding department. Doing this work, he would use a broom to gather the steel dust into a pile, then transfer it with a shovel into a conveyor vehicle. In the grinding department, there were about ten machines with emery wheels, and at each an operator stood, pressing the pieces of iron against the revolving emery wheel, which would cause a current of steel dust to fly out from the wheel. The largest pieces of steel would produce more dust when pressed against the emery wheel than the smaller ones. On the morning of December 23, 1943, he had no fever, and was not coughing, until about ten o'clock a. m. About that time in the morning, he was engaged in cleaning up around the machines in the grinding department, and, while he was stooped over, trying to clean out the accumulation of steel dust around and under the grinding machine, the operator stepped to one side to allow Bass to reach under the machine, but at the same time pressed the casting he was grinding against the revolving emery wheel. The current of steel dust thereby produced struck Bass in the face, causing him to gasp or catch his breath (as a person does when water is suddenly and unexpectedly thrown into his face). He inhaled the dust coming in the current off the emery wheel, it "smothered him down," and he was immediately struck with a violent paroxysm of coughing. He stopped work and went to the water cooler; stayed off from work about fifteen minutes; had fever that afternoon, and continued to cough. After quitting work that afternoon he went home. He had fever, bought aspirin thinking it would help that, went to his home, took a bath and went to bed. From that time, didn't know anything at all until he woke up in the hospital about a week later. Stayed in the hospital that time about 15 days, coughing "every breath," and with his whole side and left lung paining him. Then was taken to his brother Tom's home, in an ambulance, and stayed there in bed for three months, unable to get out or to walk; was carried back to the hospital on two different occasions, then went to another brother's home, where he stayed in bed almost all the time, for two and a half months. His feet and legs swell, he can hardly walk, his lung bothers him all the time, keeps a cigar box under his bed, because he coughs at night and covers the bottom of it with blood and corruption. Can't shut his hands, and hasn't much use of his left arm and leg; has lost about 20 pounds, and is in a bad nervous condition; doesn't sleep well. After he came to, noticed that the color of the stuff he would spit up was black. When he was cleaning up, he did not have anything to protect his nose from the dust; but the operators of the grinding machines, who stood over the machines, wore

masks and leather aprons. It was at least six months before he was able to leave his room after he sustained the injury on December 23, 1943; during that time, wasn't able to write; couldn't hold a pencil in his hand; couldn't even hold a knife and fork. Never had any trouble with his lungs, hands or feet, nervousness, and loss of weight, before December 23, 1943.

"Q. You didn't get smothered any time the day before or any more that day? A. No.

"Q. Just that one time? A. Yes.

"Q. You were doing it that time like you were at all other times? A. Yes; but I kept out of the current."

O. F. Dudley, witness for plaintiff, testified: I worked with Zack Bass at Texas Foundries, Inc. On December 23, 1943, at about 10 a. m., went over to the fountain to get a drink, and saw Zack Bass coming down the aisle; Bass was "coughing and heaving." Saw Bass spit; the color of it was dark. As to the condition of the dust behind the grinders while the grinders are grinding iron, at times there is not as much as at other times.

Mrs. Iva Muckleroy, witness for plaintiff, testified: Zack Bass roomed with her in December 1943. Before December 23, 1943, his general physical appearance was good, he worked regular, had never been sick while he was rooming with her, and had sustained no injury. Remembers the occasion when he came in complaining of fever; it was late in the afternoon of December 23, 1943. She prepared his bed for him; she offered to fix him some supper and he said he couldn't eat; next morning she offered to fix him something and he said he couldn't eat; fixed him some milk and he got so sick he didn't know anything and grew worse. They carried him to the hospital in an ambulance, right after Christmas. About eight months later he came back in a car to get his things; his brother helped him out of the car, and she and his brother helped him into the house. Bass doesn't look good now, gets around bad compared with his actions before December 23, and would say he has lost about 35 pounds.

Dr. George Barham, witness for plaintiff, testified: Saw Bass professionally in a little rooming house on December 30, 1943; saw him thereafter on December 31, and constantly in the hospital, where he placed Bass for treatment and where he remained until January 23. After leaving the hospital, while Bass was at his brother Tom's, saw him almost every day. Bass was confined to his bed until the first few days of March. Saw Bass once or twice at his brother E. Y.'s house; he was in bed. He treated Bass for an acute pneumonia and later for a lung abscess with a heart complication. "I have no record when he was up because he was sitting in the sunshine when I saw him. I can't be definite on that." The pneumonia caused the heart condition. Bass is unable to do any kind of manual labor, and that condition is permanent.

"Q. If steel dust were taken into the lungs and inhaled into the lungs and bronchial tubes, what effect in all reasonable probability would that have? * * * What effect would it have on the organs involved: A. At first it can irritate it and does irritate the lining of the wind pipe and maybe the bronchial tubes and in that instance it can be thrown off by the outpouring of mucous. You get down in the smaller bronchial tubes and some of those can be counterplugged or sealed off from air and gives any sort of germ a chance. That causes irritation of the lung as well.

"Q. As to whether, or not, it can, what are the facts? A. It will cause irritation of the bronchial tubes and sealing off irritation of the lung. * * *

"Q. If inhaled in a large or unusual quantity, how soon will it appear, congestion appear? A. Within twenty-four hours he can have it."

Dr. A. E. Sweatland, a witness for plaintiff, testified as follows:

"Doctor, assume this man before December 23, 1943, was healthy, a normal individual for his age, had no serious illness up until then, able to do hard labor without ill effect, and on that date inhaled steel dust into his lungs about 10 o'clock in the morning; that afternoon he began to have fever and on the night of the 23rd he was taken down with a severe congested lung; later hospitalized and delirious a part of the time when he first became ill, and that the condition existed which you found from your examination and x-ray. In your opinion what effect would the inhaling of the steel dust have in producing that condition and his inability to perform labor when you saw him in June, 1944? * * A. Yes, that could cause it. * * *

"Q. In all reasonable probability; would that be the cause of his condition? A. I

can say this, if you will allow me: He could very easily have breathed enough dust to cause his fever and disturbance of his lungs and the result that followed. I can't go further because I don't know and nobody on earth don't know. * * *

"Q. What effect would the inhaling of steel dust into the lungs and bronchial tubes have on the tissue of the lungs and bronchial tubes? * * * A. It would irritate and cause trouble. * * *

"Q. What would that irritation cause? A. He could have pneumonia following it, serious irritation of the lungs. * * *

"Q. If he had inhaled steel dust on December 23rd and immediately had pneumonia following that, in your opinion did the steel dust cause the pneumonia? * * * A. Yes; it could be assumed, soon after the inhaling.

"Q. How soon would the irritation of the lung caused from inhaling steel dust produce pneumonia? A. If he suffered it—if sufficient, it could be very soon.

"Q. Within a few hours? A. Yes."

Dr. Sweatland was invited by counsel for defendant to go out and inspect the grinding room and machines at the foundry. Upon his return from such inspection, the Doctor testified:

"Q. Did you go to the foundry and see a grinding machine in operation? A. Yes. * * *

"Q. They invited you to bend down when those sparks would come off. A. Yes; but I didn't.

"Q. If a man did do that, he wouldn't stay bent down very long. A. I wouldn't expect him to.

"Q. It isn't reasonably probable that would cause pneumonia, bending down and coming up one time, as quick as you could get out of the sparks, like the snap of your finger? A. It depends if it was a blast of dust.

"Q. It was just like you saw it that day and bend down and come up. A. Those sparks are probably not inhaled. They are too coarse, but there is a dust with them they could inhale.

"Q. How much would he inhale going down and coming up? A. I don't know.

"Q. It is not reasonably probable to say that caused his pneumonia. A. I think it could if he got a gust of it.

"Q. If he did it was like you saw it, it wouldn't do it immediately going down and coming up, for an instant. A. He might get a gust. * * *

"Q. I am just talking about what you saw when you went out there, all you could see was sparks. A. Yes.

"Q. And you say they are not inhaled. A. I don't think they are.

"Q. And going down and coming up would cause no ill effect, only a tingling of the skin. A. It might if he got the finer dust. * * *

"Q. After you saw the machine in operation and you say you saw a lot of fine dust under the machine, as well as big grains of dust or steel, after you saw that and assuming the man was in good general health before that time, and worked around that machine, and stooped down and inhaled some of that dust, and immediately began coughing and heaving, and within a few hours had developed fever and spit up a substance colored black, and within a few hours after that he contracted pneumonia and in a few days became delirious. In your opinion what produced the condition which he had? * * * A. I answered it. I think it could have. * *

"Q. Assuming those facts to be true, after seeing it in operation, what, in your opinion caused him to have pneumonia? * * *

"Q. And within a few hours began to have fever, and soon after that it was found he had pneumonia. A. It could have brought it on."

Jones Lowery, witness for the defendant, testified:

Emery wheels operate toward the grinder, and throw out a stream of dust; a lot of it accumulates on the floor. The regular cleaning man uses a spray bucket and sprinkles the floor, because some of the dust will rise when he sweeps.

Robert B. Turner, a witness for the defendant, testified:

Never saw a man bend down and put his face in the current from the emery wheel. Emery wheel makes about 1800 revolutions per minute. Dust accumulates around grinding machines two or three inches deep. Some coarse and some fine enough to float in the air. Grinding table is about 3½ or 4 feet from the floor. A man cleaning about the table and under it would have to stoop down, if he were stooping and they started grinding and caused the sparks and dust to come out, he would naturally catch his breath and inhale more

dust if he had his face right over it. He could inhale some of it.

Dock Armstrong, a witness for the defendant, testified: A man wouldn't put his head down into the stream of sparks coming from the grinding machine unless he was crazy. "Anybody knows it would hurt you to get in that stuff that way." Wouldn't put his head there because would be likely to inhale some of the dust.

Dr. Tinkle, a witness for the defendant, testified:

"Q. Usually, when a man has pneumonia, something has irritated the lung, either a cold or he has breathed some gas or something that has irritated the lung. A. Yes; usually . * * * Before they have pneumonia it must start an irritation, and one whiff of any dust would not produce enough irritation to make the germs take hold.

"Q. If it produces enough to make him cough and heave, would that indicate it might? A. It might irritate his lung.

"Q. He is still suffering from the effects of pneumonia? A. Yes; he still has a little stuff in the left lung that shouldn't be there. * * * I say he is able (to work).

"Q. You examine a good many men for these industries. A. Yes.

"Q. If you examined him, would you pass him? A. No."

Dr. George Barham testified on cross-examination that he was not in a position to testify as to what caused appellee to have pneumonia and that he would not undertake to do so under any kind of a hypothetical question, while Dr. Sweatland, appellee's other medical witness, gave the following testimony on cross examination:

"Q. Doctor Sweatland, you are not telling the jury steel dust caused him to have pneumonia. A. I answered that, I think.

"Q. Answer it for me. You are not saying that caused it. A. It could.

"Q. It could not have, too. A. It might not have.

"Q. All you can say is he might have had it if he hadn't worked out there and he might not. A. This is about right.

"Q. One is as reasonably probable as the other? A. Yes."

Appellant's contentions are that the evidence set out above amounts to no evidence, that appellee sustained an accidental personal injury and that there is no evidence to show that appellant's condition resulted from any alleged breathing of steel dust, and cite, among other cases, Jones v. Traders & Gen. Ins. Co., 140 Tex. 599, 169 S.W.2d 160; Houston Fire & Casualty Ins. Co. v. Biber, Tex.Civ.App., 146 S.W.2d 442; Texas Pac. Fidelity & Surety Co. v. Hall, Tex.Civ.App., 101 S.W.2d 1050; Texas Employers' Ins. Ass'n v. Burnett et al., 129 Tex. 407, 105 S.W.2d 200. In view of the well recognized rule, that, in determining whether an instructed verdict or a motion for judgment non obstante veredicto should have been granted, the evidence in the case must be considered in the light most favorable to the party against whom such motions are sought; that conflicts will be disregarded and every reasonable inference deducible from the evidence must be indulged in his favor, we overrule appellant's contentions. We are of the opinion that the testimony offered by appellee was entirely sufficient to raise the issues that he had received an accidental personal injury and that such accidental personal injury was the producing cause of the disability found by the jury. American General Ins. Co. v. Ariola, Tex.Civ.App., 187 S.W.2d 585; Fry v. Dixie Motor Coaches, Inc., supra; Safety Casualty Co. v. O'Pry, Tex.Civ.App., 187 S.W.2d 578; Carter v. Travelers Ins. Co., 132 Tex. 288, 120 S.W.2d 581.

By point No. 3 appellant contends that there was no evidence to establish a good cause for appellee not having notified his employer of his alleged accident prior to the time when he did so notify it, on May 4, 1944, the injury having occurred on December 23, 1943. In this connection, appellee plead that he gave notice to his employer, Texas Foundries, Inc., within 30 days after his injury and made the additional allegation that Texas Foundries, Inc., had notice of plaintiff's injury within 30 days from the date of the accident. The defendant in its answer, which was properly sworn to, in paragraph 3 thereof pertaining to notice or want of notice alleged the following: "Further specially answer, defendant says that the plaintiff failed to notify his employer or this defendant within 30 days from the alleged date of his alleged accident." This is the only denial by defendant that plaintiff had given proper notice of the alleged accident. It will be noted that the defendant did not deny that it had actual notice within 30 days of appellee's alleged inju-

ries, nor does it appear from said pleading what fact that appellee failed to notify his employer of within 30 days from the alleged date of his accident. Therefore, such pleading was not sufficient to require appellee to produce evidence showing good cause for not having given notice to his employer within 30 days after his alleged accident nor showing that his employer had actual knowledge thereof, these matters being admitted when not denied under oath. Article 8307, Sec. 4a, Vernon's Civil Statutes; Rule 93, Texas Rules of Civil Procedure. However, in view of the fact that the evidence showed that appellee became unconscious during the night following his injury and remained in that condition for several days, that it was six months after he sustained his injury before he was able to leave the room, during which time he was not able to write, and the medical testimony showing that he was desperately sick for 30 days with acute pneumonia, and developed a lung abscess and heart complications, and that it was some four or five months before appellee was able to attend to any business, and other testimony to the effect that during that period of time his mind was bad, we are of the opinion that such evidence was not only sufficient to raise the issue but was sufficient to support the jury's finding that appellee became physically and mentally incapacitated to give notice of his injury to Texas Foundries, Inc., and that such physical and mental incapacity to give notice continued from the time of its beginning until he gave notice through his attorney to Texas Foundries, Inc., and that his physical and mental incapacity was good cause for his failure to give notice to Texas Foundries, Inc. until his notice thereof was given through his, Bass' attorney. The jury also found that at the time Bass sustained his injury he believed it to be trivial and of no consequence; that he held such belief until he became physically and mentally incapacitated to give notice of his injury to Texas Foundries, Inc. We, therefore, overrule appellant's point No. 3.

 By appellant's 4th and 5th points it complains of the action of the trial court in overruling its objection to the testimony of Dr. Sweatland and Dr. Barham with reference to their opinions in connection with the effect that breathing of steel dust had upon appellee, contending that such opinions amounted to no more than mere possibilities and, therefore, not admissible.

In support of this contention it cites Houston & T. C. R. Co. v. Fox, 106 Tex. 317, 166 S.W. 693, and cases there cited. While it seems to be well settled that while medical testimony as to future consequences of an injury must be limited to reasonable probabilities, expert medical testimony that it is possible that a condition already in existence was caused by a prior injury is admissible. Langenfelder v. Thompson, 179 Md. 502, 20 A.2d 491, 136 A.L.R. 963; St. Louis & Southwestern R. Co. v. Taylor, 58 Tex.Civ.App. 139, 123 S.W. 714; Galveston H. & S. A. R. Co. v. Grenig, Tex. Civ.App., 142 S.W. 135; National Mutual Cas. Co. v. Lowery, Tex.Civ.App., 135 S.W.2d 1044, affirmed 136 Tex. 188, 148 S.W.2d 1089. Furthermore, substantially the same testimony is otherwise in the record without objection and therefore if the ruling of the trial court be error it was harmless. These points are overruled.

The record as before us presents no error requiring a reversal of this cause, therefore the judgment of the trial court is affirmed.