**FORT WORTH & DENVER RAILWAY COMPANY, Appellant,**

v.

**Albert JANSKI, Appellee.**

No. 15379.

United States Court of Appeals
Fifth Circuit.

June 28, 1955.

Culton, Morgan, Britain & White, James C. Sanders, Amarillo, Tex., for appellant.

Denning Schattman, Joe Spurlock, Davis, Schattman & Lewis, Fort Worth, Tex., for appellee, Albert Janski.

Before HUTCHESON, Chief Judge, and TUTTLE and JONES, Circuit Judges.

JONES, Circuit Judge.

Albert Janski, the plaintiff, appellee here, was a fireman of the defendant, Fort Worth and Denver Railway Company, appellant here. On July 24, 1951, plaintiff was working on a passenger train of defendant entering its yards at Dalhart, Texas, at a speed of around 45 to 50 miles per hour. An open switch caused plaintiff to jump. He sustained injuries for which he sought damages of the defendant under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq.

The defendant admitted liability. The jury found damages as follows:

Loss of earnings to date. .$ 9,550.00
Future lessened earning
   capacity ............. 18,552.00
Pain ................. 5,000.00

The District Court overruled the defendant's motion to set aside the verdict, entered judgment on the verdict and denied defendant's motion for a new trial. The defendant has appealed, urging that inadmissible and prejudicial testimony was received and that the verdict was excessive.

Between the time of the accident and the bringing of the suit, a surgical operation had been performed on plaintiff's neck. At the trial, Dr. F. C. Rehfeldt, a neurologist, was being examined as a witness for the defendant. The witness had not performed nor been present at the neck surgery. He testified that he had examined the plaintiff eight or nine months after the accident and diagnosed his condition as occipital neuralgia. The witness recommended rest for the plaintiff because "he had a carbuncle on his neck just prior to that time". Then followed these questions and answers:

"Q. And, Doctor, of course you did not do the operation on his neck? A. No.

"Q. And you have been referring to it as a carbuncle. Doctor, could it have been a hematoma in the tissues of the neck? A. Well, the only basis I have for my statement was the patient's statement—

"Q. Yes, sir. A. —That there was an abscess or carbuncle in the neck.

"Q. What is a hematoma in the tissue of the neck? A. A hematoma is a collection of blood.

"Q. And of course you hardly ever find a patient that will use the word hematoma, will you, in giving the history of a case? A. I would be most surprised to hear that.

"Q. Now, Doctor, oft times where a man, say for instance, rolled

one hundred twenty feet down the right-of-way after getting off an engine at fifty miles an hour, many times it causes injury to the soft tissues of the neck, does it not? A. Sure.

"Q. And blood could accumulate there and then later become infected, could it, Doctor?

"Mr. Sanders. If Your Honor please, I will object to this line of questioning. There is no evidence that there was any hematoma, as far as I know, in the case at all.

"The Court. Overruled.

"Q. It could couldn't it, Doctor? A. Yes."

■ Claiming that causation should not be conjectured where effect is not shown, the defendant asserts that the admission of the quoted testimony was erroneous and highly prejudicial. To support its position, the defendant cites Traders & General Insurance Co. v. Bass, Tex.Civ.App., 1946, 193 S.W.2d 848, and other Texas cases. It is well settled that expert medical opinion cannot properly be admitted where based upon a hypothesis of facts without evidence of such facts. 3 Jones on Evidence, 2d Ed. 2425, § 1326. But the facts supporting the hypothesis of the question need not be in evidence where the facts assumed are supplied by later testimony. Proechel v. United States, 8 Cir., 1932, 59 F.2d 648, certiorari denied 287 U.S. 658, 53 S.Ct. 122, 77 L.Ed. 568. This corollary of the rule would be particularly applicable where the witness from whom an answer to a hypothetical question is sought is put on out of turn. Such is not the situation here. No showing was made and no effort was made at any time during the trial to show that there was a hematoma on plaintiff's neck.

■ It may have been error to overrule the objection made on the ground as stated, "There is no evidence that there was any hematoma * * * in the case at all". But was the error, if error it be, prejudicial? The remainder of Dr. Rehfeldt's testimony was:

"Q. And, Doctor, what cervical glands are there in that area that could become imbedded? A. Sir, I don't know how to answer that because I don't know what it is you have in mind on the basis of the information you have given me. I have in mind that you refer to the hair follicles.

"Q. The what? A. Hair follicles in the neck which directly become affected.

"Q. What is that? A. Well, it's the little sac from which the hair takes its origin, is nourished, produced.

"Q. Doctor, state whether or not, in your opinion, this could exist in this patient: That this patient probably suffered a cervical sprain of a moderately severe degree which produced a chronic irritation of the right occipital nerve, and the abscess in my opinion there is also additional irritation probably from an inflammatory and infectious process which took place at the time of the accident? Do you think that possible, Doctor? A. I can't conceive of his having an abscess from 1951 to 1953.

"Q. You think that possible irritation at the nerve root at the time of this rather violent accident and him attempting to use the neck to try to make a living in the meantime could keep that nerve or its connecting tissues irritated to where it finally became infected? A. No, I think turning his head with a collar on it could do it. That's the most common cause of carbuncle in the neck.

"Q. Now, Doctor, I believe you stated that you have had patients—

"The Court. I will interrupt there.

"(Short recess, and the witness was excused.)"

The portions of the testimony of Dr. Rehfeldt last quoted dispel any harm or prejudice that might have otherwise re-

sulted from the hematoma questions and answers. He having said the plaintiff told him about the carbuncle stated that the infection causing it could not have taken place at a time as remote as that of the accident. The admission of the testimony worked no prejudice to the defendant. The defendant, if it felt the testimony as to hematoma harmful, could have, and we think should have, made a request that the jury be instructed to disregard it. See Fidelity & Casualty Co. of New York v. McKay, 5 Cir., 1934, 73 F.2d 828.

■ The plaintiff testified that he became unconscious upon hitting the ground after jumping from the moving train. He made a number of references on both direct and cross-examination to dizziness, a condition which was not substantiated by the testimony based upon objective examinations made by the medical experts. Dr. Marsalis, a witness called by the defendant, while under cross-examination by plaintiff's counsel gave testimony regarding the relationship of brain concussion to unconsciousness. Continuing along this line there occurred the following:

"Q. And, Doctor, assume the man was unconscious for a solid week; that is no indication of the severity of the jarring or concussion or bruising of the brain? A. No. Whenever a person is unconscious for any length of time, it's purely that the brain tissue itself is having some pressure on it. When that pressure is relieved you get relief from your coma, but it does not mean the amount of concussion that you have. That's what I am trying to explain to you. I mean, the time element, a person can stay unconscious for a week or ten days and wake up and not have a bit of concussion—what I mean by that, not a bit of dizziness. He can get up and in two or three days go about —I don't mean go about, but I mean he doesn't have the dizziness that a lot of them suffer from being unconscious an hour or not being uncon-

scious at all—that's what I'm trying to explain to you.

"Q. Doctor, isn't it true that sometimes a person gets a blow on their head causing some period of unconsciousness, and then they have some periods of forgetfulness, they have some periods of dizzy spells sometimes for life? A. Sure.

"Q. Even though the x-ray doesn't show it? A. Sure.

"Q. The neurological exam wouldn't show it?

"Mr. Sanders. If Your Honor please, he is inquiring into possibilities, continuing to inquire into possibilities. I don't think that's a proper form of cross-examination in a case of this sort. He has made no inquiry into reasonable certainty or anything like that. I object to the line of cross-examination on that ground.

"The Court. Overruled."

The defendant asserts that the Court's ruling is erroneous in admitting medical testimony concerning the possible future effects of plaintiff's injuries.

■■ The question to which the defendant's objection was made and overruled was not answered so there was no harm resulting from the ruling, whether or not the objection was well taken. The defendant contended that the witness should not have been permitted to testify that some times a person getting a blow on the head resulting in unconsciousness has periods of dizzy spells for life. Such testimony, it is urged, was conjectural and speculative. It was the sole testimony relating to the permanence of plaintiff's attacks of dizziness. It seems to be well settled that medical testimony as to future consequences of an injury must be limited to reasonable probabilities. Traders & General Ins. Co. v. Bass, Tex.Civ.App., 1946, 193 S.W.2d 848. The testimony must establish a probability, not a mere possibility of causal connection. Fort Worth & Denver City Ry. Co. v. Smith, 5 Cir., 1953, 206 F.2d 667. There was no objection made at the tri-

al to the question and no request made that the jury be instructed to disregard the testimony. For the purpose of appeal, erroneous admission of evidence cannot be considered unless the question was raised during the trial. Wigmore on Evidence, § 18.

During the cross-examination by plaintiff's counsel of Dr. Marsalis, he was asked whether he x-rayed plaintiff, and the doctor answered "no". He was asked if he bandaged plaintiff's right shoulder, and the witness replied that he didn't recall doing so. Then ensued the following:

"Q. [by Mr. Spurlock, Plaintiff's attorney] I show you the record of Loretta Hospital—just a moment— over the signature of Sister M. Ignatius, Medical Librarian, showing that he suffered—

"Mr. Sanders. [Defendant's attorney] If Your Honor please, I will object to counsel testifying from whatever memorandum that he's offering in evidence there.

"Mr. Spurlock. I am trying to refresh his memory, counsel.

"The Court. Is that something from the hospital?

"Mr. Spurlock. It's Loretta Hospital's regular librarian. I was using it simply for the purpose of refreshing his memory. I wasn't offering it in evidence.

"The Court. Let him look at it, then, and see what it does about refreshing his memory. A. Do you want me to read this out loud or not?

"Q. No, sir, I am asking you particularly—

"Mr. Sanders. If Your Honor please, could we see this? A. I will have to read the whole thing to get it."

Apparently the whole of the hospital record was read by the witness. The defendant urges that counsel for the plaintiff was guilty of misconduct in placing evidence before the jury which the Court had ruled inadmissible and improper. The only objection to the hospital report

was "to counsel testifying from whatever memorandum that he's offering in evidence there". There was no further reading from the hospital report by plaintiff's counsel. The purpose of the objection as made was accomplished. The hospital record was never offered in evidence. The witness, and we again observe that he was defendant's witness, reiterated his comment about reading the whole thing. He continued to read, often reading matter not germane to the questions despite some effort by plaintiff's attorney to get responsive answers.

In support of this contention the defendant cites:

"It is misconduct for an attorney to propound to witnesses questions as to matters concerning which he is aware that the witnesses cannot testify or apparently to prove certain things in a mode in which they cannot be proved, with a view to falsely impressing the jury." 41 Tex.Jur. 744, § 38.

■ Not always does the mere asking of an improper question constitute reversible error, and a party who has made no objection to the questions propounded, has not requested that the jury be instructed to disregard the testimony, nor made any motion for a mistrial, is in no position to complain of misconduct. Colls v. Price's Creameries, Tex.Civ.App., 1951, 244 S.W.2d 900, citing Tex.Jur.

■ The defendant makes the further point that the damages found by the jury and incorporated in the judgment are so excessive as to show motivation by bias, passion, prejudice and partiality. Each of the three items of the verdict is questioned. The defendant's position as to loss of earnings to the date of the trial is that simple arithmetic demonstrates the amount found by the jury is too much by not less than $2,300. In making its arithmetical calculation, the defendant uses a basis of computing the time lost from work as a result of the accident different from that advanced by the plaintiff. The amount found by the jury is more than the one and less than the

other. The question is one for the jury and the amount ascertained by it should not be disturbed.

As to future disability there is a wide divergence of the testimony of the medical experts. The defendant's witness, Dr. Rehfeldt, a neurologist, testified on the basis of his objective neurological examination that, in his opinion plaintiff could go back to work and do certain designated things which are assumed to be the routine duties of a railway fireman. The defendant's witness, Dr. Marsalis, the attending physician, said that from his physical examination he could not find anything to show that plaintiff shouldn't perform the duties of a fireman, but he qualified his answer by saying "If he has the symptoms he complains of, that makes a different matter". The defendant's third medical witness, Dr. Thomas, was an orthopedic surgeon. He found no evidence from objective observation that plaintiff was disabled to perform the regular tasks of a workman. For the plaintiff Dr. Parnell testified that he "didn't think he [the plaintiff] should be allowed to do that work." He said "it would be a total disability for those duties". He expressed the opinion that such disability in the future is "going to be permanent, at least most of it is".

Dr. Jackson, also an orthopedic surgeon, whose deposition was taken on plaintiff's behalf, said that the plaintiff "is probably—as I say, I am not quite sure just exactly what a fireman has to do, but I think he probably has at least 25% permanent disability". The defendant urges that as the plaintiff offered the testimony of Dr. Jackson he is bound by Dr. Jackson's opinion as to the degree of disability. The general rule that a party who tenders a witness vouches for his credibility is not to be extended so as to bind a party to the opinion of an expert. This Court has said:

"A litigant may vouch for the good character and general credibility of a witness without being estopped to deny the correctness or truthfulness of any particular fact or facts testified to by such witness."

Liberty Mut. Ins. Co. v. Hanovich, 5 Cir., 1948, 171 F.2d 168, 169.

The parties introduced testimony as to plaintiff's expectancy and the methods and rates of reducing future earnings to present value. All of the factors incident to the determination of the plaintiff's future lessened earning capacity were for the jury. The defendant has not shown that the award is excessive.

The jury's finding for pain was $5,000. The defendant says this is twice the amount that could be allowed in the absence of prejudice, passion or bias. The amount was fixed by the jury and no reason appears for setting it aside. The plaintiff detailed his suffering and the medical experts could not say he did not sustain the pain as described by him.

We find no prejudicial error and the judgment is

Affirmed.