**AETNA INSURANCE COMPANY, Appellant,**

v.

**Mrs. Myrtle Lucille HART et vir, Appellees.**

**No. 13196.**

Court of Civil Appeals of Texas.

Houston.

June 19, 1958.

Rehearing Denied July 10, 1958.

Ralph S. Carrigan, William C. Bullard, Houston, Baker, Botts, Andrews & Shepherd, Houston, of counsel, for appellant.

Frank T. Abraham, W. James Kronzer, Houston, Hill, Brown, Kronzer & Abraham, Houston, of counsel, for appellees.

BELL, Chief Justice.

This is a workmen's compensation case. A judgment was rendered in favor of appellee, Mrs. Myrtle Hart, based upon a jury verdict finding her to be totally and permanently disabled.

Mrs. Hart worked for the La Rosa Cleaners at one of their substations in the City of Houston. On May 18, 1955, while she was engaged in the performance of her duties, an Air Force officer who had left at the cleaners a pair of trousers to be mended and cleaned came to get the trousers. He had been to the place on two or three occasions before. On one occasion he had become upset because a shirt on which he had had the sleeves shortened had shrunk and he claimed the fault was not in any shrinking but in the alteration. In any event he was, on that occasion, very unpleasant, so that Mrs. Hart dreaded seeing him come to the place after that.

When he arrived on May 18 about 2 o'clock p. m., Mrs. Hart was alone in the place of business. She recognized the man as soon as he got out of the automobile. She, because of the previous unpleasantness, dreaded him when she saw him get out of his car. He was a pretty nice looking fellow, "but sure was a rough looking guy." He asked for his trousers and when Mrs. Hart got them he took them and "ripped" the sack off, looked at them and then slung them on the counter at Mrs. Hart. Mrs. Hart said she did not know whether he was going to knock her down or not. As the officer slung the trousers at her he said they were not clean. He spoke short to her. When Mrs. Hart stated she would send them back and have them done over, he stated he needed them. The officer stayed there and kept prancing up and down by the counter. He then reached into his pocket and she didn't know what he was going to do. She didn't know whether he had a gun or not. She thought of there being a back door to the place of business but if she ran out of it he might shoot her. When the hand came out of the pocket he had a $20 bill which he threw down on the counter. Mrs. Hart said she was so rattled she couldn't make the change. He reached over and snatched the $20 bill off the counter and put it back in his pocket. The officer then took the trousers, but before leaving the premises he tore up the statement written for the work done and threw it on the floor. Mrs. Hart said the way the man was talking, she couldn't tell whether he was going to shoot her or not. He was talking rough and rude to her and he frightened her. He had said when she did not make the change, "This is a pretty outfit, can't change a $20 bill." This made her feel bad. She thought he was going to hit her with the trousers. While the officer was still there she felt so weak she "just kind of laid over the counter." The officer had scared her by the course of conduct above related. Just after the officer left, Mrs. Hart's son came in. The officer had gone

but the son came in two or three minutes later. She told him she had just had a run-in with a guy.

Dan, the son, walked in the front door of the substation and saw his mother standing at the counter and "she was sort of slumped over." She was leaning, from half of her body she was down and the counter was supporting her. Saliva was coming from her mouth and her face was beginning to twist. He could understand her a little bit. He picked her up and put her on a chair. Her face began to draw. He noticed her left leg was limp and extended in a position so it could not be controlled. Her left arm fell off the arm rest of the chair. A doctor was called and he directed that she be taken home.

There is no question under the evidence that Mrs. Hart had a stroke. Also, there is no question that Mrs. Hart is totally and permanently disabled. We have not yet recited the medical testimony, but will do so in connection with the points asserted with respect to it.

The jury answered the four issues submitted to it finding as follows:

1. Mrs. Hart received a personal injury to her body.

2. Such injury was an accidental injury.

3. Such injury was received in the course of her employment.

4. The accidental injury was the producing cause of incapacity.

Appellant, as grounds for reversal, makes the following contentions:

1. There is no evidence, or alternatively there is insufficient evidence, to establish an *accidental* injury since the encounter with the officer, which gave rise to the emotional stimulus that precipitated the stroke, was merely a personal one involving no assault, battery or wrongful act.

2. There is no evidence, or alternatively insufficient evidence, to establish an acci-dental injury within the course of employment since the incident precipitating the stroke created no greater hazard than that to which plaintiff would have been exposed apart from the employment.

3. There is no evidence causally relating the encounter to the stroke since such medical testimony is based upon an assumption that at the time of the encounter plaintiff was suffering from high blood pressure, and there is no evidence of probative value establishing that she was suffering from high blood pressure.

4. There is no evidence causally relating the encounter to the stroke suffered by plaintiff bcause the evidence shows it may have occurred by reason of several causes and it is not more reasonably probable that the incident was more operative than other possible causes.

5. There was insufficient evidence to show a causal relationship between the incident and the stroke.

Appellant first contends there was no accidental injury because the stroke suffered by Mrs. Hart was precipitated by an emotional upset arising from a mere personal encounter involving neither an assault, battery or other wrongful act. The basis for such contention seems to be certain language used by our Supreme Court in Bailey v. American General Insurance Company, 154 Tex. 430, 279 S.W.2d 315, 322.

In the Bailey case the Supreme Court held that traumatic neurosis resulting from an emotional stimulus which was produced by an incident involving a risk or hazard of the employment was a damage or harm to the physical structure of the body and compensable under the Workmen's Compensation Act, Vernon's Ann.Civ.St. art. 8306 et seq. The Court, in the course of its opinion, in discussing whether there could be a recovery for traumatic neurosis under our Compensation Act, noted that under the cases of Gulf, C. & S. F. Ry. Co. v. Hayter, 93 Tex. 239, 54 S.W. 944, 47 L.R.A. 325, and Houston Electric Company v. Dor-

sett, 145 Tex. 95, 194 S.W.2d 546, assuming negligence on the part of a defendant, a recovery at common law could be had for physical injury resulting from fright alone, the fright being the product of a defendant's negligent act. The Court then said:

"Another compelling reason to hold that the type of injury sustained by petitioner comes within the definition of 'injury' as contained in the statute is the fact that the Workmen's Compensation Act eliminates the right of an employee to bring an action for damages against an employer subject to the Act, except as provided by statute. The holdings in the Hayter and Dorsett cases, supra, support the proposition that the 'injury' sustained by petitioner would be compensable under the common law, dependent, of course, upon findings of ordinary negligence. We do not believe that the Legislature intended that such an injury as sustained by petitioner would be compensable at common law, but not under the Compensation Act. To hold otherwise would place the employer in the position of being required to defend an action at common law even though such employer had exercised the foresight to qualify under the terms of the Act and procured compensation insurance for the protection of both the employer and employee. Further, the employer, in order to provide for himself adequate protection, would be forced to provide for insurance against liability at common law or assume the risk of becoming individually responsible for the payment of any judgment which might be obtained against him as the result of such common-law action, while at the same time he was paying compensation insurance premiums for the protection of his employees under the Workmen's Compensation Act."

█ When the Court used this language it was not talking of any requirement of legal wrong by the employer or its representatives, under the compensation law. It was merely saying that the Legislature intended to make an injury caused by an emotional stimulus compensable under the Compensation Act because the Legislature abrogated the right of an employee to bring a common law action against an employer for an injury received in the course of his employment attributable to a risk of the employment, and, to deny recovery under the Act would leave the employee without remedy, and to hold the Act did not cut off the employee's right of action the employer would not be given the protection intended by the Act. There need be no legal wrong on the part of the employer or his representatives to fix liability under the Workmen's Compensation Act. To recover under the Act it need only be shown that an injury to the physical structure of the body was sustained by the employee as a result of a risk or hazard of the employment while the employee was acting in the course of his employment.

Appellant further contends there was no accidental injury because the incident subjected Mrs. Hart to no greater risk or hazard than that to which the ordinary public is subjected.

█ We cannot agree to this proposition of law. Actually, though many cases speak of an "accidental" injury, there is nothing in the Workmen's Compensation Act which requires that the injury be the result of an accident. The Act does not cover intentional wrongs because the Legislature could not constitutionally deprive the employee of his common law right to recover for such wrongs. Middleton v. Texas Power & Light Co., 108 Tex. 96, 185 S.W. 556; Texas Employers Ins. Ass'n v. Agan, Tex.Civ.App., 252 S.W.2d 743 writ ref.; IX Baylor Law Review, pp. 145–165. In the last cited case is a fine review of the authorities on the question as to whether an accident is required.

We think the effect of the many decisions is that if an injury is shown to have been

received by an employee while he is acting within the course of his employment and such injury is the result of a risk or hazard of the employment, it is compensable under the Workmen's Compensation Act.

It will be found in most cases that the court submits a special issue to determine whether the injury was accidental, and defines an accident as something occurring suddenly, unexpectedly and undesignedly. However, what the court is really seeking to determine is whether the proof shows an injury attributable to a risk of the employment and one which is not due to an intentional wrong, or to one of the other specifically excepted situations set out in Article 8309, Section 1, V.A.T.S. It is a matter of causal relation between a risk or hazard of the employment and the claimed injury.

In the case of Maryland Casualty Co. v. Rogers, Tex.Civ.App., 86 S.W.2d 867, 870, writ ref., the court had before it a situation where an employee died from pneumonia. He was working at a feed store, grinding feed. A particularly dirty load of feed was ground and the deceased, during the grinding, coughed violently, spit up some black substance and complained of his chest hurting. The incident occurred on a Friday. The employee was sick about a week and died from pneumonia. There was medical testimony establishing causal relation between the incident and pneumonia. It was contended there was no accidental injury. The Court of Civil Appeals in affirming the case said this:

"True, the cause of the injury here was not purely an accident as if the roof had fallen in, etc. Such a narrow construction is at variance with the wholesome purpose of the law. If the injury was undesigned and unexpected, had its 'origin in a risk connected with the employment,' and is shown to have flowed immediately and directly from that source as a rational consequence, it is compensable. * * * The injury

was unexpected and undesigned. It could be traced to a definite time, place, and cause. The evidence met the demands of the law."

In the case of Maryland Casualty Co. v. Broadway, 110 F.2d 357, 359, the Circuit Court of Appeals for the Fifth Circuit had before it a case where an employee was at an ascertainable time and place subjected, while at work, to sulphur dioxide fumes. He contracted pneumonia and died. It was contended there was no accident. The court said:

"The Texas statute does not mention accident, but the courts have said that the injury must be attributable to some definite occurrence; one must be able to assign it a time and place and cause."

The evidence in this case is sufficient to meet the test as to an undesigned, unexpected and definite occurrence assignable to a definite time, place and cause.

But, says appellant, if the injury grows out of a risk or hazard no greater than that to which Mrs. Hart, as a member of the general public, would be subjected, the injury does not arise out of her employment. In support of this position, it cites Southern Casualty Co. v. Flores, Tex.Com. App., 1 S.W.2d 260; Gorman v. American General Ins. Co., Tex.Civ.App., 179 S.W.2d 814, ref. w. m., and Fidelity & Casualty Co. of N. Y. v. Neas, 5 Cir., 93 F. 2d 137.

In both the Flores and Gorman cases the courts did use the expression to the effect that the injury came from a hazard to which the workman would have been exposed apart from his employment, and it was, therefore, not compensable. Actually, in each case the employee while at work was just walking along and had a heart attack and died. There was absolutely no proof of an undesigned, unexpected, definite occurrence connected with the employment that could be the cause of the heart attack. Evidence of a causal

relationship between a hazard of the employment was absent. The injury, therefore, was not shown to have grown out of the employment. It is also to be noted that in the Flores case the Supreme Court merely approved the judgment recommended by the Commission of Appeals. This merely means the Court felt the Commission of Appeals reached the correct result, but the court did not necessarily approve all of the reasons stated by the Commission in its opinion. We agree that the correct result was reached under the facts of the case. Very much the same is to be said of the Gorman case because the Supreme Court refused a writ of error for want of merit. This means that Court felt the Court of Civil Appeals, in the particular case, correctly applied the law to the facts so that there is no reversible error, but the Supreme Court was not satisfied that the opinion of the Court of Civil Appeals in all respects correctly declared the law.

With the statement in the Neas case we cannot agree. Actually, such statement was unnecessary to the decision because the evidence showed an undesigned, unexpected occurrence traceable to a definite time and place which involved a risk of the employment which resulted in an injury in the course of his employment.

Our Supreme Court in the case of Garcia v. Texas Indemnity Company, 146 Tex. 413, 209 S.W.2d 333, 337, had before it the question of whether an injury received by an employee, when he fell against a post on the employer's premises after he had an epileptic seizure, was a compensable injury. It was contended there was no accidental injury growing out of a risk of his employment since epilepsy caused the fall. The court, in overruling such contention, said:

"Danger of injury from a fall at some other place might have been no less, but it certainly was not the same. See Connelly v. Samaritan Hospital et al., supra [259 N.Y. 137, 181 N.E.

76]. 'The risk may be no different in degree or kind than those to which he may be exposed outside of his employment. The injury is compensable, not because of the extent or particular character of the hazard, but because it exists as one of the conditions of the employment.' Savage v. St. Aeden's Church, supra, 122 Conn. 343, 189 A. 599, 601. Since there is no claim that the fall was caused by any third person's intention or by Garcia's intoxication, we must hold that the cause of his fall is immaterial."

In Lumbermen's Reciprocal Ass'n v. Behnken, 112 Tex. 103, 246 S.W. 72, 73, 28 A.L.R. 1402, the Supreme Court, at an early time in the history of our compensation law, said this of it:

"What the law intends was to protect the employee against the risk or hazard taken in order to perform the master's task."

A person may fall on the floor at work and injure himself; he might have fallen elsewhere and received the same injury, but the fact is he did not. The injury, however, is compensable. An employee may be stung by a wasp in the performance of his work; he might have been stung elsewhere, but if in the performance of his duties he receives the injury he is to be compensated. Indemnity Ins. Co. of North America v. Garsee, Tex.Civ.App., 54 S.W.2d 817, no writ history.

A night watchman, while performing his duties, might have been injured and robbed of his personal property; he might have had the same thing happen elsewhere, but the fact is this was a risk of his employment, and he is to be compensated. Vivier v. Lumbermen's Indemnity Exchange, Tex. Com.App., 250 S.W. 417.

In Traders & General Ins. Co. v. Rooth, Tex.Civ.App., 268 S.W.2d 539, ref. n. r. e., an employee while performing his duties ruptured an aneurysm. He was in a posi-

tion where his head was below his knees as he was tightening a bolt, causing slight strain. His injury was compensable. This injury might have occurred at any time from a similar situation, but the fact was it did not, and since it occurred in the course of his employment and was caused by a risk of the employment it was a compensable injury.

■ Mrs. Hart's employment, where she must deal with the public to carry out her master's business, subjects her to the risk of being berated as she was by complaining customers. There is in this case an undesigned, untoward event traceable to a definite time and place involving a risk of the employment. Of course, this must have been the producing cause of the stroke suffered by Mrs. Hart.

Appellant contends there was a want of evidence, or, alternatively, there was. insufficient evidence to show the stroke was the result of fright, because the medical testimony was based on the assumption that at the time of the injury Mrs. Hart was suffering from high blood pressure and there is no evidence showing she was so suffering. We must review the testimony.

Dr. Thoma was the first medical witness. He had seen Mrs. Hart on August 19, 1953. At that time her complaint was of pain in the region of the coccyx. She had some ulcers in her mouth. She complained of pain in her right hip. Her blood pressure was quite high, being 198/120. She complained of no symptoms of high blood pressure such as dizziness, numbness or blackout spells. He knew of no reason she was not able to perform physical labor, because while she had high blood pressure people with high blood pressure work. Mrs. Hart was obese and Dr. Thoma put her on a diet designed to cause her to reduce her weight. He testified it is reasonable to think that a shock affects the blood pressure. A shock, if it did raise the blood pressure, could cause a cerebral hemorrhage.

Speaking generally, an emotional stimulus will, in reasonable probability, cause a stroke in people having high blood pressure. Shock affects the blood pressure. Appellee's attorney then propounded to Dr. Thoma an hypothetical question containing the assumption that Mrs. Hart had high blood pressure on May 18, 1955, the day of the stroke, and, reciting the facts testified to by Mrs. Hart concerning the encounter with the Air Force officer, asked if in reasonable probability the incident was the precipitating cause of the stroke. The doctor answered, "If she continued having the same blood pressure that she had two years previously, why, I would say it could. Now, I don't know whether her blood pressure was higher than it was when I checked her or whether it was lower; but it could be that high or higher, then the logical thing, also conclusion to reach is that any disturbance might have raised it up a few extra points, to cause it to bust out. * * * If her blood pressure was as high or higher, which it could have been, then we have to admit any disturbance, accident or nervous shock or anything could raise the pressure temporarily enough to cause a cerebral accident." The appellee's attorney then asked, "And from what you know about this case, do you think, based on reasonable probability, that it did?" The doctor answered, "Well, all I know of the case two years previous to this I would say so, but I don't know anything about the case at the time of the accident." The attorney then reminded the witness he was to include the other facts included in the hypothetical question, and the doctor answered, "Well, assuming that her blood pressure was that high, then it is logical to say that any shock could have been or was the factor possibly causing the hemorrhage, yes; but I am just assuming that the blood pressure was that high or higher."

The doctor said he prescribed a diet when he first treated Mrs. Hart because there was a direct relation between weight and blood pressure. He finally stated he was not giving his opinion in this particular.

case because he did not know what her blood pressure was on May 18, 1955.

Dr. Fields, a specialist in the field of neurology and professor of Neurology at Baylor University College of Medicine, was called by appellee. He examined Mrs. Hart October 8, 1956. He took a history from her which coincided with her testimony on trial. He gave her a complete neurological examination. Her blood pressure at this examination was quite elevated, it being 190/115. He examined her eyes and, from seeing the blood vessels in her eyes he could tell she had arteriosclerosis which was of 18 months' to two years' duration. He stated she had suffered a stroke. The stroke could have been caused by a hemorrhage, a spasm of the blood vessel, or a clot from another part of the body that broke loose and lodged in the brain. No one would be able to say definitely which happened. He answered, in reply to a hypothetical question encompassing Mrs. Hart's testimony as to the incident and other material facts in evidence, that in reasonable probability the incident related by Mrs. Hart was the precipitating cause of her stroke. The question included the blood pressure of August 18, 1955, and October 8, 1956. This is precisely what the witness answered:

"Yes, sir. I think I do. I think that one must assume from the medical point of view, apart from the aspect of the history of this particular incident, that we had, as you stated, a woman who was known to have been hypertensive; that is, to have had high blood pressure for several years. The evidence on my examination that she had hardening of the arteries, as appeared from examination of her eye grounds, this is the kind of change that hasn't come over night. I think that one must assume that the hardening of the arteries was present as much as a year, 18 months or even 2 years before this period of time. So we have, then, a situation in which we

have high blood pressure and damaged blood vessels. And it is not unreasonable to assume that with a psychological shock, or some fright, or anger, that one may have resulting from this, first, an alteration in blood pressure. Usually the blood pressure goes up. * * * If one has a psychological emotional shock one can have either one of two things happen, and I think this is evidenced both in the medical literature and in my own experience to indicate that one may have a small hemorrhage or one may even more commonly have a spasm in a blood vessel, causing an already narrow channel to become narrower for a period of time, which will embarrass the circulation of the part that needs this oxygen and other things, so that when —even though the channel may once again become its normal size, the damage has been done beyond repair."

At another part of his testimony the witness testified that an emotional stimulus would or could cause the spasm, a hemorrhage or a clot which would break loose and travel to and lodge in the brain. Each of these things would or could cause a stroke. He, of course, testified that a person could have a stroke lying in bed, just walking along a street, or shopping at a grocery store. But to use the witness's statement, " * * * it didn't happen this way."

At another place the witness testified the incident "may well" have been the precipitating factor of the stroke. It was his opinion that it was in reasonable probability the producing factor of the stroke.

On cross-examination the witness testified that he could make no conclusion from the two blood pressure readings that Mrs. Hart had continuing high blood pressure. However, the witness, though cross-examined intensely, persisted in this conclusion, in the light of all facts of the case, that the emotional stimulus caused by the incident with the Air Force officer could

well be the precipitating cause of the stroke and probably was.

 We have reached the conclusion that there was evidence, and it was sufficient to support the jury's verdict, that Mrs. Hart, on May 18, 1955, had hypertension. Of course, we know not, with mathematical exactness, what it was. All circumstances in evidence, however, establish she was hypertensive. She had two readings, one in August, 1953, and one in October, 1956, showing a greatly elevated blood pressure. This, standing alone, might not suffice, but in addition you have a continuing obesity, which Doctor Thoma relates to hypertensivity, and arteriosclerosis. Too, we think the effect of both doctors' testimony is that without high blood pressure you would not expect a stroke.

Appellant says that since the stroke could have resulted from several things the evidence is insufficient to show it resulted from the emotional stimulus. We cannot agree. We have recited much of the medical testimony above and think it suffices to preclude the conclusion that the precipitating cause of the stroke was anything other than the emotional stimulus produced by the incident with the Air Force officer.

The fact that in diagnosing the cause of a person's illness or trouble the medical experts may have used the terms "could", "May well have" and comparable terms, is not objectionable and does not render such experts' opinions insufficient. Texas Employers' Ins. Ass'n v. Talmadge, Tex.Civ.App., 256 S.W.2d 945, ref. n. r. e.; Traders & General Ins. Co. v. Bass, Tex.Civ.App., 193 S.W.2d 848, ref. n. r. e. Actually, we think that Dr. Fields' testimony is that it is reasonably probable that the emotional stimulus caused the stroke, though in some places he used the expression, "it may well have been."

Finding no error, the judgment of the trial court is affirmed.