EMZIE CARTER ET AL V. TRAVELERS INSURANCE COMPANY.

No. 7165. Decided November 2, 1938.
Rehearing overruled January 25, 1939.
(120 S. W., 2d Series, 581.)

*Clark & Clark,* of Fort Worth, for plaintiffs in error.

On the question of the sufficiency of the evidence: Texas Emp. Ins. Ass'n. v. Birdwell, 39 S. W. (2d) 159; Texas Emp. Ins. Ass'n. v. Moore, 279 S. W. 516; Texas Employers Ins. Ass'n. v. Clark, 23 S. W. (2d) 405.

*Thompson, Knight, Baker & Harris and Pickney Grissom,* all of Dallas, for defendant in error.

There is no evidence that Vera Carter sustained any accidental injury while in the course of her employment for the subscriber in question. Texas Emp. Ins. Ass'n. v. Herring, (Com. App.) 280 S. W. 740; Allen v. Republic Bldg. Co., 84 S. W. (2d) 507; Galveston, H. & S. A. Ry. Co. v. Powers, 101 Texas 161, 105 S. W. 491.

MR. JUSTICE CRITZ delivered the opinion of the Court.

This is a compensation suit. It was tried in the District Court of Tarrant County, Texas, on appeal from a final ruling of the Industrial Accident Board denying compensation. It appears from the record before us that Vera Carter, a colored woman, died in Tarrant County, Texas, on or about September 16, 1933. It is contended by the plaintiffs in error, who are her surviving husband and minor children, respectively, that Vera Carter died of an injury to the physical structure of her body, which injury was received in the course of her employment as an employee of the Texas Hotel at Fort Worth, Texas. Travelers Insurance Company was the compensation insurance carrier for the Hotel. The case was submitted to a jury on special issues in the district court. The verdict of the jury was for the claimants, and judgment was entered accordingly. This judgment was reversed by the Court of Civil Appeals, and judgment rendered for the Insurance Company. 94 S. W. (2d) 1221. The case is before this Court on writ of error granted on application of Emzie Carter et al., the surviving husband and children, respectively, of the deceased.

The jury, in response to appropriate questions, among other things, found:

1. That on or about August 11, 1933, Vera Carter received an injury to the blood vessels of her brain.

2. That such injury was the result of an accident.

3. That such injury was sustained in the course of her employment.

4. That Vera Carter died as a result of such injury.

If we properly interpret its opinion, the Court of Civil Appeals reversed the judgment of the district court and rendered judgment for the Insurance Company on the ground that the statement of facts contains no evidence of probative force showing, or tending to show, that Vera Carter sustained an injury to the blood vessels of her brain in the course of her employment with the Texas Hotel. In this holding the Court of Civil Appeals did not reverse and remand the case, but, as already stated, reversed and rendered it. We are therefore called upon to decide a law question, and not a fact question. If this record contains any evidence of probative force showing, or tending to show, that Vera Carter died of an injured blood vessel in her brain, and that such injury was sustained in the course of her employment with the Texas Hotel, the judgment of the Court of Civil Appeals cannot stand. The determination of this question involves a rather extended examination and discussion of the evidence, as contained in the statement of facts.

In view of the jury's verdict, we think the record in this case shows the following:

That Vera Carter was an employee of the Texas Hotel on August 11, 1933, and for sometime prior thereto; that during such employment Travelers Insurance Company carried the compensation insurance for the Hotel; that Vera Carter was employed by the Hotel as a maid; that Vera Carter's duties as an employee of the Hotel required her to work in rooms that were very hot and required her to constantly lift and handle articles which were very heavy for a woman to lift and handle; that some of these articles weighed seventy-five or eighty pounds; that Vera Carter was also required to move heavy furniture, some of it weighing several hundred pounds; that for about a week before Vera Carter quit her work she would complain of severe pains in her head, and as a consequence of her pains would have to lie down and rest; that these pains would appear after Vera Carter had been at work in hot rooms, lifting heavy articles and moving heavy furniture; that, finally, during one of these spells Vera Carter was sent home, and from there to the hospital, where she died in about thirty days.

It was further shown that up to the time Vera Carter began having the spells with her head, above described, she

was a woman in fairly good health, and weighed anywhere from one hundred and twenty-five to one hundred and forty pounds. There is also evidence that Vera Carter had high blood pressure, and may have had other physical ailments.

Emzie Carter, the husband of the deceased, testified at considerable length, and, as bearing on the cause of Vera's death, we think his testimony justifies the following conclusions:

That Vera worked for the Texas Hotel as a maid; that she remained in seeming fair health until about a week before she quit work; that for about a week before Vera quit work she would complain of her head when she came home from the hotel; that such pain did not first appear at home; that she would lie on the bed, and Emzie rub her head and down her side; that during this time she complained of her head, right side, arm and leg; that Vera had gotten so that she could not move her right arm and leg, except with difficulty; that after Vera went to the hospital she had the same troubles and pains she had at home; that Vera vomited some before she went to the hospital; and that Vera was a woman about twenty-seven years old at the time of her death.

The witness Mary Holloway testified, in substance, that she knew Vera Carter during her lifetime; that she saw her frequently while she was working in the Texas Hotel as a maid; that she remembered that Vera Carter gave up her work at the Hotel and was sent home sick; that she knew that Vera Carter had to go to bed when she got home; that Vera was sick for several weeks after being sent home, and remained confined to her bed; and that Vera suffered "misery" in her head and right arm and side, and back.

The witness Mrs. N. L. Wheeler testified, in substance, that she remembered Vera Carter as an employee of the Texas Hotel; that she would judge she weighed about one hundred and twenty-five or one hundred and thirty pounds; that Vera Carter appeared to be a healthy woman; that the day Vera quit the witness happened along, and Vera began to cry and said that her head was hurting her so badly she could not work; that witness told Vera she should not be there trying to work, but should go over to Dr. Terry's office, which she did; that Vera never came back to work after that; that Vera told witness the pain was in the back of her head; that the above events occurred in the morning; that Vera did not complain when she came to work; and that Vera had made the complaint to the witness after she, Vera had been working two or three hours.

The witness Sarah Bell Rice testified, in substance, that she knew Vera Carter while both she and the witness were working at the Texas Hotel; that while Vera worked at the Hotel witness had occasion to be around her a good deal; that witness knew and observed the kind of work Vera was doing; that such work required Vera to lift heavy loads and move heavy furniture; that some of the loads Vera had to lift weighed seventy-five or eighty pounds; that Vera sometimes had to carry these heavy loads for a distance equal to a city block; that for about a week before Vera quit work she complained of her head hurting her very badly; that on several occasions witness would stop work and help Vera; that Vera would stop work and lie down a few minutes, and then try to work again; that Vera did not complain any before she did work, but afterwards; that after Vera would clean a room and move things she would just give out, seemingly; that the maids were not allowed to turn on the fans in the rooms while at work, and, therefore, in August such rooms were usually very hot.

The witness Dr. L. F. Rhodes qualified as a medical expert, and, in substance, testified that the symptoms detailed above evidenced a possibility that Vera Carter died of a cerebral hemorrhage. Dr. Rhodes then, in substance, testified that a cerebral hemorrhage could be caused by heavy lifting; that a cerebral hemorrhage is a hemorrhage of one of the blood vessels in the brain, which might leak a little bit, or might leak a whole lot, producing instant paralysis or gradual paralysis; and that in a hemorrhage of the brain the blood leaks inside the brain,—that is, inside the cerebrum. We here quote the following from the testimony of Dr. Rhodes:

"Q. Assuming that a person was in apparent good health and had not suffered with any pain in her head or with any of the symptoms I have detailed, until after she did the lifting, state whether or not in your opinion the lifting and the exertion would be the cause of the cerebral hemorrhage?

"A. Yes.

"Q. Doctor, is a hemorrhage of that kind usually fatal?

"A. Yes, sir, in a certain length of time; you may have a second or a third hemorrhage, and it usually results in death.

"Q. So, in your opinion, although this condition that has been detailed here to you could have been produced by these things that were detailed to you, there are probably lots of other things that could possibly cause it?

"A. Certainly. It could have been the initiative cause, don't you see, with the other diseases you spoke of.

"Q. And over-exertion rather more often than not produces the condition immediately after the unusual exercise, doesn't it?

"A. Certainly.

"Q. And does not ordinarily wait for some time to do its work?

"A. It might bring on a small leak there, don't you see, and if they kept on exerting, and so on, why gradually it might increase the leakage of the blood vessel that would eventually kill the patient; that is a possibility.

"Q. Assuming that a person has high blood pressure, may a strain or heavy work or over-exertion bring on the hemorrhage?

"A. Certainly.

"Q. Then assuming that a person had hardening of the arteries or troubled with her kidneys, would you say that the heavy lifting and the exertion was the immediate cause of death?

"A. Yes, sir.

"Q. Assuming the symptoms I have given you before, is it or is it not your opinion that the hemorrhage was due to the straining and lifting, assuming all those things to be true?

"A. That would be my opinion, because the woman was perfectly well up until that time."

Dr. R. A. Ransom, a colored doctor, after qualifying as a medical expert, testified, in substance, that he knew Vera Carter during her lifetime; that Vera Carter was in his hospital at the time of her death; that he treated her during her last illness, and remembered the occasion of her death; that he examined her and made a diagnosis as to the cause of her death; and that his diagnosis was that Vera's death was caused by a hemorrhage of the brain. Taken as a whole, Dr. Ransom's testimony shows his diagnosis was based on his personal examination of the patient and the history of her case.

We quote the following from the testimony of Dr. R. J. White, who testified after qualifying as a medical expert:

"Q. If she doesn't have the full use of the arm and leg and she is suffering with a severe headache, doesn't have the use of the arm and leg that she had before, that would be a symptom of apoplexy, would it not?

"A. I think if she was paralyzed definitely and the doctor could establish it, it would yes.

"Q. Well, paralysis is the inability to use a part of the body, isn't it?

"A. That is correct, if it is associated with other certain

findings and reflexes and other things by which we can know it and we are sure it is bonafide and real.

"Q. Well, do you agree with this authority further; 'in cerebral hemorrhage the breaking of the vessel may be caused by undue exertion'?

"A. Well of course, that is— I can't dispute that and won't at all, no, sir.

"Q. They may have a slight attack and appear to get better and go on about their work and then have another attack that results in death, can't they?

"A. Of course, if it is so slight an attack that they appear to get better and go about their work, unless that is followed by symptoms of paralysis, say they cannot handle their arm, or they have a pulling to one side of the face, it is a question whether it is real apoplexy; I don't think that we can recognize near all of them, but unless they do have symptoms of paralysis, I don't think we say that is true.

"Q. But assuming that they have symptoms of paralysis in the arm and leg, that would be a symptom of apoplexy, wouldn't it?

"A. That is a most common thing; of course, brain tumors and other things can do it.

"Q. Suppose it was apoplexy in the back part of the head, would that cause paralysis?

"A. Well, it would have to involve the motor tracts; a common place for apoplexy, of course, is down in the deep part of the brain where these little tracts which are like telephone wires converge from these cells which control the movement and are gathered into a rather small bunch, and there is an artery that goes through there and a little hemorrhage there can give a lot of paralysis to the side, because these tracts are gathered together."

We also quote the following from the testimony of Dr. H. H. Terry, who testified after qualifying as a medical expert:

"Q. Apoplexy can come on more or less gradually, may it not; in other words, there may be a small opening in the blood vessel and as time goes on and more blood oozes out it finally brings on a fatal stroke?

"A. I presume that is possible.

"Q. And when this blood vessel in the brain—if there is a small crack there and a small oozing, that is likely to cause a headache, is it not?

"A. I presume that it would, yes.

"Q. I will ask you if it isn't a fact that they teach that one

of the main symptoms of it is headache, and one of the first symptoms is a headache?

"A. That is true.

"Q. Well, assume that there is a predisposing cause, assuming that there is high blood pressure, may the rupture be brought about by straining and lifting?

"A. Yes, sir."

■ Under the evidence above detailed, we think it cannot be said, as a matter of law, that this record contains no evidence of probative force which would support the jury findings above indicated. Certainly the evidence amply supports the conclusion that Vera Carter's death was produced by a cerebral hemorrhage. Of course, it is not enough to prove this, but the evidence must go further and show that such hemorrhage constituted an accidental injury, and that it was sustained in the course of Vera's employment with the Hotel. If this hemorrhage occurred while Vera was at work, and was brought on, produced, or caused by her having to lift and carry heavy loads, and move heavy furniture, we think accidental injury in the course of employment has been established. Southwestern Surety Ins. Co. v. Owens (Civ. App. writ refused), 198 S. W. 662; Georgia Casualty Co. v. Mixner (Civ. App. writ refused), 289 S. W. 420. It has been held that strain sustained by an employee in the course of his employment is generally regarded as an accidental injury. This being true, it certainly ought to be held that a ruptured blood vessel brought on, produced, or caused by heavy lifting or moving of heavy objects in the course of employment is an accidental injury.

■ If we properly interpret their brief and written argument, counsel for the Insurance Company contends that even if it should be admitted that Vera Carter died as the result of a ruptured blood vessel in the brain, still there is no evidence contained in this record showing, or tending to show, that she sustained the same in the course of her employment at the Hotel. We overrule this contention. It is true that the evidence on this point is not direct, but, to the contrary, is largely circumstantial. Taken as a whole, however, we believe it can not be said, as a matter of law, that there is no evidence in this record supporting, or tending to support, the findings of the jury on this question. In this regard the evidence is legally sufficient to show the following: That Vera Carter had the characteristic symptoms of a ruptured blood vessel in the brain; that the physician who treated her at the hospital until her death, and for some weeks prior thereto, and who knew

the history of her case, diagnosed her death as due to a ruptured blood vessel in the brain; that Vera Carter was required to lift heavy articles and move heavy furniture in the course of her employment in the Hotel; that the symptoms of a ruptured blood vessel first came on Vera Carter while she was at work in the Hotel; that after Vera Carter lifted heavy articles and moved heavy articles she complained of aches, pains, etc., which showed symptoms of a ruptured blood vessel in the brain; and that in the opinion of medical experts such lifting and straining could have caused the ruptured blood vessel.

■ It seems to be conceded that Vera Carter was earning $7.00 per week at the time of her death, and that that sum is the proper sum upon which to compute her average weekly wage for compensation purposes. Section 8 of Article 8306, R. C. S. 1925, provides, in substance, that if death results from the injury the compensation carrier shall pay the legal beneficiary of the deceased employee a weekly payment equal to 60 per cent. of the average weekly wage of the deceased, but not more than $20.00 per week, nor less than $7.00 per week, for a period of 360 weeks. It follows that ,under the statute, in this case the compensation, not accelerated in any way, would be $7.00 per week for 360 weeks.

Section 15 of Article 8306, supra, provides for lump sum settlements of compensation in certain instances. The jury found against such settlement in this case, and we are not concerned with a judgment under Section 15, supra.

Section 15a of Article 8306, supra, read as follows:

"Sec. 15a. In any case where compensation is payable weekly at a definite sum and for a definite period, and it appears to the board that the amount of compensation being paid is inadequate to meet the necessities of the employe or beneficiary, the board shall have the power to increase the amount of compensation by correspondingly decreasing the number of weeks for which the same is to be paid allowing discount for present payment at legal rate of interest; provided that in no case shall the amount to which it is increased exceed the amount of the average weekly wages upon which the compensation is based; provided it is not intended hereby to prevent lump sum settlement when approved by the board."

In response to special issue No. 8, the jury found that manifest hardship and injustice would result to claimants if compensation was not paid at a rate of more than $7.00 per week. In response to special issue No. 9, the jury found that

$14.00 per week would be a just and fair amount for the claimant to receive. Based on these answers, the trial court entered judgment for accrued compensation at the rate of $14.00 per week, with accrued interest from August 11, 1933, and then gave judgment for future weekly installments at the rate of $13.52 per week for a period of 140 weeks. A reading of the above-quoted statute will show that the judgment rendered is not only not authorized by Section 15a, supra, but is in direct contravention thereof. This Section of the statute authorizes the increase of the amount of the weekly compensation by correspondingly decreasing the number of weeks for which the sum is to be paid, allowing discount for present payment at legal rate of interest; but the statute does not stop there. It then says: "provided that in no case shall the amount to which it is increased exceed the amount of the average weekly wages upon which the compensation is based; * * *." This language is clear, and expressly prohibits the weekly payments from being increased beyond the amount of the average weekly wage upon which the compensation is based. Vera Carter's weekly wage was $7.00 per week. It follows that compensation in this case cannot be increased, under Section 15a, supra, beyond that amount per week. The trial court's judgment clearly violates the latter clause of Section 15a of Article 8306, supra.

■ Counsel for the claimants earnestly insist that, even if the above statute is violated in this judgment, no injury has resulted to the Insurance Company, because the judgment has been discounted at the legal rate of interest for the accelerated payments. This is no answer. The judgment must be authorized by statute. In this instance, the judgment is not authorized by statute, but is prohibited thereby.

We have carefully examined the brief of the Insurance Company in the Court of Civil Appeals. We find no other error in the judgment of the district court.

It is ordered that the judgments of the Court of Civil Appeals and the district court be both reversed, set aside, and held for naught. It is further ordered that judgment be here rendered in accordance with this opinion. Plaintiffs in error shall pay all costs in the Court of Civil Appeals. The Insurance Company shall pay all costs in this Court and in the district court.

Opinion delivered November 2, 1938.

Rehearing overruled January 25, 1939.