**TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellant,**

v.

**Elma E. HATCHER, a Widow, et al., Appellees.**

**No. 4081.**

Court of Civil Appeals of Texas.

Waco.

Feb. 28, 1963.

Rehearing Denied March 21, 1963.

Jones, Boyd, Westbrook & Lovelace, Waco, for appellant.

Naman, Howell, Smith & Chase, Waco, for appellees.

TIREY, Justice.

This is a compensation case. On a verdict favorable to plaintiffs the Court entered a judgment in their favor and against the insurance carrier for the sum of $35.00 per week for 360 weeks beginning December 8, 1961, and the further sum of $500.00 as funeral benefits, together with interest at the rate of 4% per annum on the unpaid installments of compensation and for costs. The Court further found that 29 weeks compensation had accrued, totaling $1015.-00, and fixed the interest thereon, and decreed accordingly. The Court also fixed attorneys' fees at 30% of the recovery in favor of plaintiffs' attorneys, and decreed accordingly.

The Court overruled defendant's motion for judgment non obstante veredicto and its amended motion for new trial, and it perfected its appeal to this Court.

The judgment is assailed on five points, each containing sub-heads. They are substantially to the effect that the Court erred: (1) In failing to sustain defendant's various motions for a directed verdict and judgment non obstante veredicto after plaintiffs failed in their burden to prove their case by a preponderance of credible, probative evidence. Then follows various sub-heads from (a) to (i) inclusive.

A statement is necessary. Plaintiffs grounded their cause of action on the fact that James O. Hatcher met his death while engaged as an employee of the Lone Star Gas Company on December 8, 1961, and while in the pursuance of his duties of employment he was required to deliver gas to customers of such company; that in making a delivery of gas before his death on December 8, 1961, the employee was required to unwind an unusually long and heavy high pressure hose from a large stationary reel on the back of the delivery truck, and that in order to transfer the gas from the truck to the customer's tank

it was necessary for said Hatcher to stretch out and pull the heavy hose over a distance of approximately 70 feet, and connect the hose to the customer's tank; that after filling the tank the employee had to pull the hose and coil it around a large reel on the back of the truck; that in so doing it was necessary for him to raise the heavy hose and raise each coil above his head in order to rewind it around the reel; that the hose being heavy, stiff and hard to manage, the employee was subjected to an unusual strain and exertion; that in performing this labor he suffered a sudden and unexpected and unusual strain, which caused an infarction of his heart, or a heart attack, from which he died some few minutes later, and that the employee sustained an injury resulting in his death in the manner aforesaid, and by reason thereof his injuries and death were and are compensable.

Defendant went to trial on its first original answer in which it denied plaintiffs' allegations, and further specifically plead that the employee did not sustain an accidental injury in the course of his employment; that on the contrary, the employee died as a result of causes or conditions unconnected with his employment. Hatcher was found dead on December 8, 1961 on South 4th Street near Garden Drive in the City of Waco, and he had previously left the home of Mr. and Mrs. Prickette just a few minutes before his death, and where he had filled a storage tank with butane gas. In leaving the Prickette home he had driven in the truck in a northerly direction on South 4th Street, and the truck was stopped and the left door was open, and the truck's ignition was off, and Hatcher was lying face down in a ditch outside of the truck at the rear, out of the roadway. There was no eye witness to his death. There was no autopsy. Testimony was admitted regarding previous pains that Hatcher had experienced, over defendant's objection, also with regard to the nature of the activity required in filling the butane tank. On the testimony tendered Dr. M. W. Col-

gin testified in answer to a hypothetical question to the effect that Hatcher had in reasonable probability suffered a myocardial infarction. It is appellant's contention that Dr. Colgin predicated his opinion upon previous chest pains, and an unusual strain. The appellees challenge the foregoing statement and contend that the record shows that Dr. Colgin did not predicate his opinion upon an "unusual strain," but rather upon the fact that the deceased was engaged in an activity which was unusual to his regular work.

■ It is the rule that the question as to whether the deceased received an accidental injury in the course of his employment which caused his death, and whether his injury was accidental, are questions for determination by the jury. See Carter v. Travelers Ins. Co., 132 Tex. 288, 120 S.W.2d 581, points (2, 3); also Texas Employers Ins. Assn. v. Smith, Tex.Civ.App., 235 S.W.2d 234, (1950) writ refused. Mass. Bonding & Ins. Co. v. Massey, 123 F.2d 447, 5th Circuit.

Dr. M. W. Colgin was tendered as a witness and he qualified as an expert on internal medicine and heart diseases. Owing to the importance of his testimony, we quote the pertinent part of his testimony. Plaintiffs propounded the following hypothetical question:

"Q. * * * I am going to ask you to assume a colored man forty-six years of age, five feet, eight inches tall, who weighed 165 pounds, was married and had five children. He had worked for the same company for some sixteen years; was a trusted and well respected employee; he had for several years been employed as a general worker in the following capacities: He installed gas light fixtures at residences which involved digging a six inch trench for *a* gasoline, setting up fixtures and connecting the pipes to it. He installed butane tanks with the help of other men by setting blocks in place and lowering the tank on to the blocks with a winch, washing and lubricating trucks. In the latter work he was furnished a power grease gun. He delivered appliances such as refrigerators and stoves by the use of man power help and a rolling dolly which was placed under the appliance. He had driven a truck to and from various locations, hauling supplies of one sort and another. He had tended the unloading of a tank car of butane gas by hooking a hose to the tank car and hooking the other end to the storage tank and supervising the running of a pump to take the gas from one to the other. He had delivered gas to retail customers in a company truck. The truck was equipped with a hundred feet of one inch ID high pressure hose that weighed about seventy to eighty pounds when stretched out as much as seventy-five feet. It had a large bronze globe valve and metal fittings on it. The hose is carried on the truck on a reel on the back end. The reel is some seven feet to the top of it from the ground. To fill the tank the truck is in most instances driven to the side of the customer's tank. A loop of hose is removed from the reel by grasping the hose with both hands and lifting it over the top of the seven foot reel. The end of the hose is then connected on to the customer's tank and the gas is pumped in by a power take-off pump on the truck motor. When the tank is full the hose is disconnected and placed back on the reel by catching it with both hands, raising it over the head with the loop projecting into the air and putting it over the seven foot reel. On December the 8th, 1961, this man had reported for work at 8:00 A. M., and had spent the morning installing a butane tank with the help of another man, and after lunch went to a home on South 4th Street in Waco to make delivery of butane gas, driving one of the company's regular trucks as before described. He went in the truck alone and drove into the driveway at the home. The weather was cold and

misty rain. The customer's tank at the home was seventy feet from where the truck was stopped in the driveway. In order to deliver the gas into the customer's tank it was necessary to remove the hose from the reel and stretch the hose seventy feet from the delivery truck to the customer's tank, connect it up and pump the gas in. The hose then was put back on to the truck by pulling the end closest to the truck and looping it over the seven foot reel, one loop at a time until it was all back on the reel. This task was unusual to the work that this man normally did. He then backed the truck out of the driveway and drove it north on 4th Street for several blocks, where the truck was found stopped and the man was found lying dead on the ground behind the truck. All of this took place within ten minutes after the completion of the delivery of the gas into the customer's tank. This man was in apparent good health, had had no illnesses or diseases in recent years. His only physical complaint had been a pain in the chest in 1958 which radiated into his arm; another pain in his chest in the spring of 1961 which radiated into his arm; and another pain in his chest on November 30, 1961, which also radiated into his arm. Now, Doctor, based upon the information which I have supplied you in the hypothetical question, do you have an opinion as to the reasonable probable cause of this man's death? Just state 'yes' or 'no'.

"A. Yes."

(At this point counsel for appellant asked permission to take the witness on voir dire, which was refused by the Court, to which appellant excepted).

There was no other objection to the question at the time it was propounded.

\* \* \* \* \* \*

"Q. Doctor, will you state to the jury your opinion as to the probable cause of this man's death?

"A. From the history that has been given to me the most reasonable diagnosis would be that the person had a myocardial infarction from which he died. Now this diagnosis is based— this opinion rather is based upon the fact that he had previously had three episodes of chest pain radiating in to the shoulders and arms. In all instances the diagnosis of angina pectoris or coronary artery disease has to be eliminated first. When s person has such pain, such symptoms, I would interpret those symptoms as those being due to angina pectoris. Such a person of course is much more subject to having a myocardial infarction or coronary occlusion and when such a person has died suddenly especially after participating in some activity to which he is not ordinarily accustomed to, the most probable mode of dying would be a coronary occlusion or myocardial infarction."

He further testified in part:

"Q. First would you explain what the word 'infarction' is?

"A. Infarction is where there is actual damage. Angina Pectoris denotes a condition where there is not actual damage to the heart muscle itself. You rest and you have an adequate supply of blood again. Or you can take nitroglycerin and it dilates the blood vessels and permits more blood to enter and there is no actual damage to the heart muscle \* \* \*.

\* \* \* \* \* \*

"Q. Doctor, can you from the hypothetical question that has been submitted to you, and the fact that this man completed this task, which was unusual to his normal work, and within ten minutes after he died—I mean in ten minutes after he completed the task he was found dead—do you have an opinion as to when this infarction took place, that is, in relation to the time of his death?"

(Appellant objected to this question and it was overruled).

"Q. How soon did it take place?

"A. Of course, it's quite likely that it could have occurred at the time of the exertion. It is possible that it might have occurred previously when he had chest pains previously, and that with the exertion he did that particular morning, that the added burden could have caused further infarction.

"Q. I am talking about the damage that was done that produced the death now, Doctor. In reasonable probability when did that occur with relation to the—

"A. Within a reasonable probability I would think that at the time of the exertion."

Dr. Colgin further testified on cross-examination in part:

"Q. What are the other symptoms of myocardial infarction besides this pain in the chest and perhaps in the arm?

"A. Of course pain is the most important symptom to the patient. Rather it has many descriptions. It's usually a rather constricting pain. It's usually accompanied by shortness of breath, by weakness, by excessive perspiration. There are often times symptoms referrable to the stomach. The persons may have nausea and vomiting and they often interpret the symptoms as an upset stomach or indigestion. Of course, depending upon the severity of it, they can go into shock and can expire in a very short time if it's a massive infarction.

"Q. Other than the possibility of referred pain or psychosomatic pain what other possibilities would explain chest pain, Doctor?

*  *  *  *  *  *

"A. Well, of course we can start almost anywhere. Any disease involv-ing the muscles of the chest can produce chest pains. Any condition involving the nerves of the—going to the chest—can produce pain. There are diseases involving the thoracic vertebrae which can produce chest pains. Gall stones are well known to produce pains similar to that of heart disease. Peptic ulcers, cardiac spasm, esophageal diverticul, shingles. It wouldn't produce the chest pain. * * * There are injuries which can produce chest pain. There are other forms of heart disease that can produce chest pain. Pleurisy and pneumonia. There is a very long list of diseases which can produce chest pains.

"Q. * * * Now you spoke of other forms of heart disease. What other forms of heart disease, Doctor, could cause a death, a rather sudden death under the circumstances described?

"A. Well, a sudden heart failure from any type of heart disease can produce sudden death. An acute overwhelming myocarditis from various' virus infections can produce sudden death.

*  *  *  *  *  *

"Q. In other words you could have the overwhelming myocarditis without a history or recent history of exertion; is that right?

"A. Yes sir, * * *."

*  *  *  *  *  *

"Q. Can death result from aneurysyms as you have described them without a history, quite recent, within the previous—?

"A. Oh, yes, they can. They can occur with or without exertion.

"Q. All right, sir. Any other heart conditions that can produce death?

*  *  *  *  *  *

"A. The heart itself can rupture. There can be ruptures of the pampilary

muscles which lead to the valves of the heart. There can be tumors in the heart which form a thrombus which can produce sudden death. A pericarditus or blood of a particular hemopericardium where blood gets in between the heart and the pericardium can produce sudden death. Of course, there are many vessels of the—I mean many conditions affecting the blood vessels themselves that can produce sudden death, not involving the heart itself.

"Q. * * * Then of these rather numerous other heart conditions other than myocardial infarction which could result without a history of recent exertion, or a number of different heart conditions such as you have described, which could result in death without there being immediate sudden exertion or over exertion; is that correct?

"A. They can produce death, yes.

*    *    *    *    *    *

"Q. And as a matter even with a myocardial infarction, which you feel this may have been, this can happen without a history of recent strenuous exertion or unusual exertion, can it not?

· "A. Yes, it can.

*    *    *    *    *    *

"Q. Doctor, are there other, other than heart conditions, are there other diseases or defects or medical explanations that could account for a man doing a job such as pulling a hose and connecting it to a tank and returning the hose and then driving a truck and being found dead five or ten minutes later in a ditch on the right hand side of the truck? Are there other medical explanations that could be considered other than myocardial infarction?

"A. Yes.

"Q. If you didn't have the pain in the chest the only reason you would be inclined to favor myocardial infarction would be because of the statistical average among people generally?

"A. Yes sir. Of course the chest pain I think is significant.

*    *    *    *    *    *

"Q. Now, Doctor, if James O. Hatcher had had these chest pains and if it had been medically determined that it was not a heart condition, then would you be disposed to believe that except on the basis of statistics of a number of people, that as far as this particular individual was concerned that you would have to consider as equally consistent not necessarily any one of the other heart conditions or the other conditions you have described, but the totality of them as equally consistent with the idea of his having died as a result of myocardial infarction?

*    *    *    *    *    *

"A. I think you can eliminate, which is difficult to do, the presence of coronary artery disease, any one of many conditions could produce sudden death. Statistically, as I said, coronary artery disease is the most common cause, but any one of the conditions I mentioned, and many others, could produce that.

"Q. * * * And then taking the totality, as I say, not matching cerebral hemorrhage against myocardial infarction or any one of the other heart or other conditions you described or indicated can exist, but taking the totality of all the other possibilities, would it be fair to say with reasonable medical probability that you could not assume, if you were asked for your opinion for example at an inquest in which there had been no autopsy, that it might have been something other than a myocardial infarction?

*    *    *    *    *    *

"A. I would say that without an autopsy it's impossible to establish the exact cause of death.

"Q. To know absolutely to a reasonable medical certainty; is that right?

"A. I would further say that with the history of chest pains radiating to the shoulder and a person forty-six years of age who was otherwise healthy, who was taking no drugs or anything else which could in themselves produce death, who was not known to be otherwise ill, who had had no other symptoms suggestive of any other disease, that the most likely cause of death would be a myocardial infarction.

"Q. All right, sir, but you could not determine with any reasonable degree of medical certainty in the absence of an autopsy or more information than you have been given in the hypothetical question?

"A. That's right."

On re-direct examination Dr. Colgin testified in part:

"Q. Dr. Colgin, Mr. Westbrook has gone into a lengthy questioning concerning possibilities of causes of death. He has gone into a number of possibilities of chest—troubles that would produce chest pains. Did I—in asking the hypothetical question (which are the facts in this case) did I give you any symptom which would lead you to believe that any of the situations which he brought on existed in this particular case?

"A. No sir. Of course, the cause of chest pains is baffling in many instances. The symptoms that you mentioned, as I said before, certainly sounded like anginapectoris and such condition would have to be eliminated before you could even consider any other disease.

"Q. Did I give you any history in connection with this that would lead you to believe that these were phychosomatic pains?

"A. No sir.

"Q. Did I give you any reason to believe that this was due to gall stones or anything like those other things that he asked you about?

"A. No sir.

"Q. After all of the questioning of Mr. Westbrook I will go back to the original hypothetical question which I submitted to you, Doctor, and which you, as I understand, said that this man suffered a myocardial infarction which was damage to the structure of his body and that that resulted in his death and that that infarction was brought on by the strain or unusual exertion that he put forth just prior to that. Now do you wish to change any part of that statement?

"A. I believe not."

■ Going back to appellant's point one, which is: Did the Court err in failing to sustain its motion for directed verdict and judgment non obstante veredicto, because of its contention that plaintiffs had failed to carry their burden and prove their cause of action by a preponderance of the credible, legal probative evidence? We think the answer is "No." Since the verdict was favorable to plaintiffs we must look at the record in the light most favorable to plaintiffs. See opinion of this Court in Traders & Gen. Ins. Co. v. Rooth, Tex. Civ.App., 268 S.W.2d 539, n. r. e., and cases there cited. Of course, we must look at this record as a whole and all of the statements contained in the hypothetical question propounded to Dr. Colgin on which he based his opinion that Hatcher died as a result of myocardial infarction, yet, at the same time, in view of the fact that he said that he considered the chest pains of deceased significant, the disposition of this case must turn on the question as to whether that testimony was hearsay and was, therefore, without probative force. It is true that the record shows that appellant filed its motion to suppress the testimony of the plaintiffs with regard to previous complaints during the decedent's lifetime

of bodily pain on the ground that they were prejudicial and statements of hearsay, and that they were not admissible under the exceptions to the hearsay rule, and thereafter, filed its motion to strike the testimony of Dr. Colgin on the ground that plaintiffs had failed to produce sufficient evidence of probative force to support the essential assumptions in the hypothetical question propounded to him.

Going back to the record it will be recalled that the widow testified to declarations of pain in the chest by the deceased in 1958 (neither the day nor month is given).

"Q. When was the next one?

"A. That was in the early spring of 1961. He had the same—made the same complaint as if it was violent. He wasn't a person to complain. He mentioned that it also cramped his arm.

"Q. Did he make another one?

"A. Yes sir, in 1961. That was in November, the last of November.

"Q. What type of pain was that?

"A. That was a chest pain also.

"Q. What day in November was that?

"A. That was the 30th of November.

"Q. That was eight days prior to his death?

"A. Yes sir.

"Q. Did he explain to you whether that pain also radiated into his arm?

"A. yes sir.

"Q. Did he make any other complaints to you at any time concerning his physical condition?

"A. No sir.

"Q. Did he ever complain about being sick or hurting or anything like that?

"A. No sir.

"Q. Those were the only complaints that he made in the last few years?

"A. Yes sir."

(Testimony was tendered as to other declarations but perhaps the foregoing are the most pertinent).

■ Much has been written on this question and it has given this Court much concern under the record here made, but as we view the opinion of our Supreme Court in Carter v. Travelers Ins. Co., 132 Tex. 288, 120 S.W.2d 581, we are of the view that the testimony of the widow and the other witnesses as to declaration of pain prior to the death of the deceased, brings this cause of action within the rule announced in the Carter case, supra. As to statements of pain or suffering made by deceased prior to the injury, see Wigmore on Evidence in Sections 1718 and 1719; also Selected Writings on Evidence and Trial, Association of American Law Schools, pages 938 and 939. As we read our decisions subsequent to the Carter case none of them modify or change the rule stated. The opinion of our Supreme Court in Casualty Ins. Co. of California v. Salinas, 160 Tex. 445, 333 S.W.2d 109, deals with declarations of pain by an injured party after the injury, but we see nothing in the opinion that changes the statement of the rule in the Carter case, supra. We have carefully considered the recent opinion of our Supreme Court in Truck Ins. Exchange v. Michling, Tex., 364 S.W.2d 172. See Texas Supreme Court Journal dated January 19, 1963, Vol. 6, No. 15, p. 238. We see nothing in this opinion that changes or modifies the statement of the rule in the Carter case, supra. Moreover, the factual situation in the Michling case is in no wise similar to the factual situation in the Carter case, or the case at bar. The opinion in the Michling case points out:

"There is not any independent proof that Hugo Michling suffered any injury at approximately the time and place alleged. There appeared to be no iron

bar across the bulldozer seat. There was no testimony from any other source that he was present at his place of employment on the day of the alleged injury. The time records of his employer indicated that Michling worked Friday, April 11th, until noon and that he did not work on the 12th. The operating records kept by his employer indicated that none of the tractors owned by the employer were in operation on that date."

We think the distinction is obvious in the case at bar. The deceased had worked every work day for his employer except one during the 16 years of employment and on the day that he met his death he had just completed one of his tasks in his line of duty, and had proceeded only a short distance from the home where he filled a butane gas tank of a customer of his employer when his truck was found on the side of South 4th Street headed in a northerly direction with the left door of the truck open, with the ignition turned off, unexplained, and the employee lying on the side of the road, almost in a ditch, with his face down. We believe the factual distinction in the case at bar with the Michling case is obvious, and that the case at bar is well within the rule applied to the factual situation in the Carter case. We are of the view that a careful reading of these cases will sustain this view. Moreover, we think one of the outstanding decisions in the Texas cases concerning the exception to the hearsay rule is found in an opinion of the late Justice Alexander in Prater v. Traders & Gen. Ins. Co., Tex. Civ.App., 83 S.W.2d 1038, n. w. h. The action was one in compensation and the pertinent testimony related to the testimony of the widow concerning declarations of her husband to her before he left on a tour of duty on the night on which he was injured in an automobile accident resulting in his death. The opinion of Justice Alexander in the Prater case is most interesting, and we believe it is accurate and in accord with the holding of our Supreme Court in

the Carter case, supra, and he cites a wealth of authority which sustains the views there stated. In the Prater case we find this significant statement:

"Although evidence of the conscious declarations of a person as indications of his state of mind has in it some of the elements of hearsay, yet it closely resembles evidence of the natural expressions of feeling, which has always been regarded in the law not as hearsay, but as original evidence, * * * and when the person making the declarations is dead, such evidence is often not only the best, but the only, evidence of what was in his mind at the time. * * *"

Among the cases cited by Justice Alexander in the above matter is Commonwealth v. Trefethen, 157 Mass. 180, 31 N.E. 961, and Mutual Life Ins. Co. v. Hillmon, 145 U.S. 285, 12 S.Ct. 909–912, 36 L.Ed. 706. The Prater case has been cited many times, with approval, by our Appellate Courts. See Elledge v. Great American Indemnity Co., Tex.Civ.App., 312 S.W.2d 722. The Supreme Court granted a writ in the case, but affirmed the decision of the Houston Court in a per curiam opinion, 159 Tex. 288, 320 S.W.2d 328, in which per curiam opinion they cited the Prater case, supra.

Since the deceased was found dead in the course of his employment under the circumstances here detailed, and as outlined in the hypothetical question propounded to Dr. Colgin, and since the Doctor's statement to the effect that the chest pains were significant in forming his opinion, we are of the view that under the Carter case, supra, and the other authorities here cited, that the declarations of pain by the deceased constitute an exception to the hearsay rule, and that they are sufficient to support the jury's verdict to the effect that Hatcher received an accidental injury resulting in his death in the course of his employment.

We have carefully considered each of the other errors complained of in appel-

lant's brief and each of the sub-heads contained under each point, and we are of the view that none presents reversable error, and each is overruled under Rules 434 and 503 of Texas Rules of Civil Procedure, and do not believe that a discussion thereof would be of any precedential value and, moreover, such discussion would unduly extend this opinion.

Accordingly, the judgment of the trial court is affirmed.