The TRAVELERS INSURANCE COMPANY, Appellant,

v.

Daniel GUEVARA, Appellee.

No. 7432.

Court of Civil Appeals of Texas.

Amarillo.

Jan. 18, 1965.

Rehearing Denied Feb. 15, 1965.

Crenshaw, Dupree & Milam, Lubbock, for appellant.

Splawn & Maner, Lubbock, for appellee.

CHAPMAN, Justice.

This is an appeal in a workman's compensation case by Travelers Insurance Company, defendant below, from a jury verdict for Daniel Guevara for two hundred weeks total temporary disability, together with $531 for hospital and doctors' expenses.

The bases of appeal are that there. is no evidence, or alternatively, that the verdict and judgment are contrary to the overwhelming weight of the evidence upon which the jury found claimant sustained an injury in the course of his employment. The same contentions are made concerning the findings of the jury that he sustained incapacity for a compensible period of time. All points are briefed and argued together.

Daniel Guevara is a Latin American, forty-seven years of age at the time of the trial and the testimony shows he had been a physically strong, capable and hard-working employee up to the time of the injury alleged. He was employed by C. M. Mitchell, who was in the furniture rehabilitation and upholstery business, and worked an average of nine hours a day, six days a week. He worked in a filling station in Ballinger from 1935 to 1940. He had lived in that city for more than twenty-eight years before the time of trial. He worked in a body shop straightening fenders and learning upholstery work from 1940 to 1946. He changed to upholstery work in 1946 and worked for the same man from that year until 1953. During that year he went into business for himself in upholstery. He went broke in that business in Ballinger about 1958 or 1959. He left his family in Ballinger and went to Plainview, where he went. to work for Mr. Mitchell in 1959 doing up-

holstery work and other work in connection with Mr. Mitchell's business. He worked for him until February 19, 1963.

Claimant commuted from Plainview to Ballinger during the years he worked for Mr. Mitchell. The evidence is conflicting as to whether he slept in the front part of the building housing the stated Mitchell business all the time he was working there except on the occasions when he went to Ballinger on weekends to see his family, but it is clear that he slept there part of the time. One witness testified he slept there all the time he was in town.

Having gone to Ballinger on the weekend of February 16, 1963, claimant did not return to work until 3:00 p. m. on Monday, February 18, 1963. Being desirous of getting in his nine hours, six days a week work he decided to work, with Mr. Mitchell's permission, until 1:00 a. m. on the morning of February 19. Business was excellent at the time and Mr. Mitchell was working several employees at night.

The building where the work was done was "about 50' x 120'" and partitioned. The front constituted the upholstery and painting work shop and the back was where the stripping of old paint was done. The partition in the building went all the way to the ceiling. The back of the building was "about 50' x 50'", contained a vat used for submerging the furniture into a heated liquid containing "a caustic chemical * * the same chemical that is used by radiator shops to clean radiators." It is an acid and burns the body upon contact.

Next to the vat was about a half-size window that had one pane out. In the roof there was a circular vent about a foot in diameter. About twenty feet from the vat was a fan about three feet high.

In the vat was a gas heater to keep the chemical solution hot in which the furniture was submerged so as to expedite the peeling off of the paint. A flue ran from the burner to the ceiling and out of the top of the building. On the nights when the

claimant slept in the front of the building, he customarily arose at 4:00 or 5:00 o'clock and lighted the gas burner in the vat in order that the solution would be boiling and ready for the employees when they came to work at 7:00 a. m.

Claimant took care of all the upholstery but when not busy with that part of the rehabilitation of the furniture, he sometimes worked in the back room where he was working on the night of February 18, 1963, "a little past 12:00 o'clock." He had gone to work in the vat area at 7:00 p. m., where his son and two other Latin Americans, Montez and Sanchez, were working.

About 12:00 o'clock that night he started feeling badly. His head started hurting and he became dizzy. "My head was going like that, (Witness waving his hands) and I couldn't see good and kind of weaking down. So, I told them I was going to lay down. And that was all. When I woke up, I was in the hospital 10:00 o'clock that day, that morning."

Claimant customarily worked in the upholstery room but on the night in question worked near the vat for five hours or more. He testified he could see the fumes in the room coming out of the boiler, "fumes, steam or its gas;" that the vat put off an odor.

"Q. Does it burn your nostrils when you're right over it working?

"A. Well, it will burn all right."

Other witnesses testified to the same effect.

When Mr. Mitchell came to work on the morning of the 19th of February, 1963, he found both Guevara and his son unconscious. He immediately called an ambulance and sent them to a hospital.

The testimony also shows that Montez and Sanchez became ill shortly after claimant lay down. Montez said he and the others wanted to keep working, "we wanted to put in at least eight hours but we decided

we better quit because we were feeling bad * * * well, it was sort of hard to explain. Felt sort of a buzz in my head like—seem like I couldn't walk straight, and I felt weak like. And we just barely got to the car and drove out of there." Neither of them worked the next day.

Claimant was released from the hospital on February 20, and went back to his upholstery work. He continued working until the 22nd. He said he had difficulty that day. "I kind of got my throat weak * * * something sick in here. I couldn't breathe."

He went back to the hospital and stayed "nine or ten days." He testified after he was released he couldn't go back to work. "Air just goes out. My breath just goes out, all over."

"Q. Do or do you not ever have any trouble with your heart?

"A. Well, you will—now I feel like my heart or breath or something in here is bad.

"Q. Dan, have you done any work since you went back in the hospital the second time after February 19, 1963?

"A. Do I do any work?

"Q. Have you done any work?

"A. No.

"Q. Have you tried to do any work?

"A. (Witness nods his head negatively.)

"Q. Why haven't you?

"A. I can't do it.

"Q. Why can't you do it?

"A. Well, my breath goes out, weakens down; my back hurt all over my back.

"Q. Dan, did you learn later on after that night of February 18th, the early morning of February 19th,

that there was a flue missing off of the exhaust out of that boiler?

"A. Well, when I was laying—when I woke up in the hospital, I asked Mr. Mitchell what happened. And he said that something in there that missing fumes was getting on the inside of the building when he went in there."

Mr. Mitchell testified that when he started checking he found a leak in the pipe going out of the boiler, "a pipe that was parted a little bit." He also testified Mr. Guevara was a good, very dependable man; that he was honest and he did not classify him as a faker.

Dr. Hill was claimant's treating physician in Plainview and later sent him to Dr. John H. Selby, a thoracic surgeon of Lubbock. Dr. Hill did not testify. Dr. R. H. Tull, a general practitioner of Abilene, testified for claimant and Dr. Selby testified for appellant insurance company.

Dr. Tull testified he examined Mr. Guevara twice for the purpose of testifying and not as a treating physician. His testimony in substance was that he had an abnormality of his throat, larynx, chest and heart, shown by examinations and x-rays. Without objection he testified that claimant was complaining of a sore throat, that if he does any exercise at all he runs out of air, that he has trouble getting his air in and out; if he walks fast his heart pounds and goes fast; he gets short of breath; had trouble with his vision and that he can do no work at all on account of his condition. Questions were then asked and answered as follows:

"Q. Now, were the subjective symptoms related to you and your objective findings compatible, Doctor? Did they lay side by side?

"A. They were.

"Q. At this time was plaintiff able to work when you first examined him?

"A. He was not.

"Q. Why was he not able to work?

"A. I don't think he could work on account of the shortness of breath he had and the fast pulse and the high pressure and especially the lack of air."

In explaining the x-rays introduced he testified, "he has a flattening out here of his heart, pushing up and almost a flattening out in this heart region, especially in this left region of his heart in the ventricular region there, I also noticed that he has an aorta that is tortuous as it comes up from the heart * * * you can see the markings here in his chest where he has had these bronchovesicular markings on each side here. Essentially, the abnormal thing here is his chest."

Dr. Tull was than asked the following question and replied as follows:

"Q. Did the abnormalities pointed out by you in plaintiff's x-ray No. 1 and found in the x-rays reasonably account for the plaintiff's inability to work as determined by you on the day you took these pictures?

"A. It did."

The doctor was then asked a series of hypothetical questions based essentially on facts that had been proven, from which he answered that claimant was not able to do any type of physical work, that such condition was permanent and that it was the effect of the gas or gases that caused it. He further testified the claimant should not do lifting, continuous straining or overhead stretching. He also testified that carbon monoxide asphyxiation effects some people differently than others and that sometimes there are short periods of time in which a victim may appear normal after such an experience and then complications set in. He testified the complications are due to the organs being without oxygen for too long a period, which destroys tissues in the brain, lungs and heart. He also testified that when he examined Mr. Guevara there was edema of the bronchus, larynx, pharynx and pulmonary and that he was in worse condition at the time he examined him on the day he testified than when he had previously made the examination.

Mr. Mitchell himself testified he had an opportunity to observe Mr. Guevara as he testified on the stand and that it seemed difficult for him to breath, a condition he did not have before the injury on February 18 or the early part of February 19, 1963.

Dr. Selby, a thoracic surgeon, with an impressive record of training and experience testified completely contrary to Dr. Tull. He made a thorough examination of the claimant, going down into his bronchial tree and chest with instruments where he could observe with a light the conditions of his tissues. His testimony in effect was that he found no abnormal conditions whatever and that he should go on back to work.

 With these facts before us we must now apply the law to them. In determining whether there is any probative evidence to support the verdict of the jury we must determine a question of law. Carter v. Travelers Ins. Co., 132 Tex. 288, 120 S.W.2d 581. If there is any such evidence, the jury findings are conclusive and binding on us. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660; Williamson v. Texas Indemnity Ins. Co., 127 Tex. 71, 90 S.W.2d 1088; Watson v. Texas Indemnity Ins. Co., 147 Tex. 40, 210 S.W.2d 989; Halliburton v. Texas Indemnity Ins. Co., 147 Tex. 133, 213 S.W.2d 677. In making this finding "we must look to the revealed facts and circumstances most favorable to the findings and disregard all those to the contrary." Truelove v. Truelove, Tex.Civ.App., 266 S.W.2d 491 (writ refused); Biggers v. Continental Bus System, Inc., 157 Tex. 351, 298 S.W.2d 79, 303 S.W.2d 359; Jecker v. Western Alliance Insurance Company, Tex.Sup., 369 S.W.2d 776.

**572**

■ Dr. Tull's testimony, the finding a day or two later of the separated pipe or flue from which the poison could have escaped, the fact that three other workers became ill that night who were working in the same room with claimant and the unconscious condition of claimant's own son even the next morning certainly show sufficient probative evidence to support the verdict to the effect that claimant sustained an injury in the course of his employment.

■ In determining whether the verdict was contrary to the overwhelming weight of the evidence requires us to consider and to set aside the verdict and remand the cause for a new trial, if we conclude that the verdict is so against the great weight and preponderance of the evidence as to be manifestly unjust. In re King's Estate, supra. Here again, the testimony of Dr. Tull must be considered, along with that of Dr. Selby, and all the other testimony. In re King's Estate, supra.

■ The medical training of Dr. Selby showed great superiority over that of Dr. Tull, a general practitioner, but for some reason, known only to them, the jurors believed Dr. Tull and did not believe Dr. Selby. They are the judges of the credibility of the witnesses and the weight to be given to their testimony and we, as an appellate court, have no right under such circumstances to disturb their findings. Maryland Casualty Co. v. Boverie, Tex.Civ.App., 37 S.W.2d 310 (writ refused); Texas Employers' Ins. Ass'n v. Clark, Tex.Civ.App., 23 S.W.2d 405 (writ dismissed). In the Boverie case the court held that where the jury's findings were supported by the testimony of two doctors in a workman's compensation proceeding, it cannot be disturbed by the appellate court, though contrary to six other doctors' testimony.

■ Then on the contention of appellant to the effect that there is no evidence that claimant sustained total incapacity for a period of two hundred weeks, or in the alternative such finding is so contrary to the great overwhelming weight and preponderance of the evidence as to be clearly wrong and unjust, we have the testimony of Dr. Tull to the effect that Mr. Guevara was totally and permanently incapacitated. Mr. Mitchell himself testified to the effect that in observing Mr. Guevara on the witness stand he noticed his difficulty in breathing; that he had not had that difficulty prior to February 19, 1963. The claimant himself testified he could not do physical work and Mr. Mitchell testified he was honest and reliable. Certainly there is some probative evidence to support the two hundred weeks of permanent disability. Under the rules of law above cited and the facts related, we cannot say the verdict and judgment are without any evidence to support them or that they are so contrary to the great and overwhelming weight of the evidence as to be wrong and unjust.

Accordingly, the judgment of the trial court is in all things affirmed.